[This opinion has been published in *Ohio Official Reports* at 90 Ohio St.3d 352.]

THE STATE OF OHIO, APPELLEE, *v*. GREEN, APPELLANT.

[Cite as *State v. Green*, 2000-Ohio-182.]

*Criminal law—Aggravated murder—Death penalty vacated and cause remanded to trial court for further proceedings when trial court fails to comply with Crim.R. 32(A)(1)—When imposing sentence, trial court must address defendant personally and ask whether he or she wishes to make a statement in his or her own behalf or present any information in mitigation of punishment.*

(No. 98-913—Submitted June 6, 2000—Decided December 20, 2000.)

APPEAL from the Court of Common Pleas of Lucas County, No. CR97-1450.

————————————

{¶ 1} On January 3, 1997, Samar El-Okdi was shot and left to die in an alley in Toledo.

{¶ 2} Around 1:40 a.m., on January 7, 1997, Toledo police stopped a Pontiac sedan, owned by El-Okdi, which was being driven by appellant, Joseph Green. Green and Douglas Coley, a passenger in the car, were separately convicted of the aggravated murder of El-Okdi and sentenced to death. In order to establish Green's identity as one of El-Okdi's killers, the state introduced evidence that Green and Coley had carjacked, kidnapped, robbed, and then attempted to murder David Moore in Toledo on December 23, 1996.

{¶ 3} On December 23, 1996, around 7:30 p.m., David Moore parked his 1990 blue Ford Taurus at his apartment complex at 2152 Scottwood in Toledo. While Moore was unloading his car trunk, Green walked up and asked for directions. Then Coley appeared, and both he and Green displayed guns held next to their chest. Coley told Moore, "Give me the keys," which Moore did. Then Coley told Moore, "Get in the car," and both Green and Coley forced Moore into

the car. Green also said, "Don't look at our faces. We don't want you to be able to identify us."

{¶ 4} Coley drove, Moore sat in front, and Green sat behind Moore. Green told Moore, "Don't try an escape or I'll kill you. I'm already wanted for murder and it won't matter, won't make any difference." Moore pled for his life, but neither Green nor Coley responded. Green did tell Moore, "Cough up the cash," and Moore gave Coley $112. Eventually, Coley stopped near a deserted field and told Moore to get out. As Moore did so, Coley shot him in the stomach.

{¶ 5} Moore ran, but stumbled and fell. Someone ran after him and shot him in the head. As his assailant walked away, Moore was able to discern that the shooter (Green) was the taller and heavier of the two men that had abducted him.

{¶ 6} As the Taurus drove away, Moore got up and struggled to a nearby house where he collapsed. Police were summoned. Moore had been shot once in the stomach, head, and arm, and twice in the hand, and spent thirty-nine days in the hospital. Police later found two .25 caliber shell casings near where Moore had been shot. On December 27, 1996, police recovered Moore's blue Taurus, which had stolen plates. At Green's trial, Moore positively identified Green as one of his assailants.

{¶ 7} On January 3, 1997, sometime after 5:00 p.m., Samar El-Okdi drove her Pontiac 6000, Ohio license number RYH 862, to her apartment at 2104 Parkwood, which is a block from where Moore lived. Raymond Sunderman, El-Okdi's landlord, recalls that she arrived home that day sometime between 5:00 and 5:30 p.m. El-Okdi's brother Shaheer remembers El-Okdi visiting his family-owned convenience store for around forty-five minutes beginning between 5:00 and 6:00 p.m. At approximately 8:00 p.m., El-Okdi dropped off film at the Blue Ribbon Photo store at Westgate Shopping Center. No one else that testified ever saw El-Okdi alive again.

2

**{¶ 8}** Around 8:30 p.m. that evening, Rosie Frusher left a friend's house at 814 West Grove Place in Toledo to use a pay telephone. As Frusher walked toward the back yard, she heard something that sounded like firecrackers. Frusher looked toward the noise and saw a gray car with long taillights, which were lit, sitting in the alley. Frusher testified that a photograph of El-Okdi's car looked like the car she had seen, and that the car's license number had a zero in it. Frusher saw a black man wearing a stocking cap sitting in the driver's seat. Another black man, who had bushy hair and resembled Green, was standing outside and leaning into the car. (Frusher could not definitively state whether Green was that man.) Frusher continued walking and called her friend from a nearby pay phone; Ameritech records confirm that the call was placed at 8:41 p.m.

**{¶ 9}** On January 4, Christopher Neal, El-Okdi's boyfriend, returned from a trip and discovered that El-Okdi was missing. Later that day, Neal notified police of El-Okdi's continued absence. El-Okdi's friends and relatives distributed missing-person flyers, which described El-Okdi, her car, its bumper stickers, and her last known whereabouts.

**{¶ 10}** On January 6, Megan Mattimoe, a friend of El-Okdi's, was parked on Scottwood waiting for a friend. Just before 11:00 p.m., Mattimoe saw a gray Pontiac 6000 that was identical to El-Okdi's car except that the license plate was different. The Pontiac had a dent on the left side, like El-Okdi's car, and bore a distinctive bumper sticker identical to one on El Okdi's car.

**{¶ 11}** Mattimoe followed in her own car until the Pontiac parked at an apartment complex and two men got out. She backed out of the parking lot, called 911, and drove away. An older Cadillac chased her for several blocks at high speed.

**{¶ 12}** After Mattimoe talked with police later that night, she and a Toledo detective returned to where the gray Pontiac was parked. Police verified that the Pontiac 6000 bore an Ohio license plate, YRT 022, that had been stolen in

November 1996.  Police staked out the gray Pontiac using five undercover police vehicles.

{¶ 13} After 1:00 a.m., Green, Coley, and a woman with a baby got into the gray Pontiac, and drove away.  Undercover police vehicles followed and, after being joined by marked police vehicles, forced the Pontiac to stop.  Green rammed one police car and spun his wheels in an effort to escape being boxed in.  After removing Coley and Green from the car, police found a loaded, brown-handled, .25 caliber semiautomatic pistol on the floor in the back seat near where Coley had been sitting.  Green had a loaded, pearl-handled, .25 caliber semiautomatic pistol in his coat.

{¶ 14} After arresting Green, police officers advised him of his *Miranda* rights and questioned him.  Green first claimed that he had rented the car for several days from a "dope fiend."  Later he told police that he had heard that Coley had obtained the car.  Finally, Green stated that Coley had told him that he had shot a woman.  Green also admitted that he had stolen license plates and placed them on the Pontiac, and that Coley had been driving the Pontiac for several days.

{¶ 15} Based on Green's interview, police found El-Okdi's body around 2:30 p.m. in an alley near where Frusher had heard shots and had seen a gray car some four days earlier.  At the scene, police found a shell casing about five feet from El-Okdi's body.  The coroner determined that El-Okdi had died from a .25 caliber bullet that struck her between the eyes and which had been fired from a distance of less than one foot.  The coroner concluded that El-Okdi did not die immediately but may have drifted in and out of consciousness.

{¶ 16} On January 8, 1997, Coley and Green were arraigned on charges relating to El-Okdi's stolen Pontiac, the stolen plates, and carrying concealed weapons.  That arraignment was televised.  Moore, who was watching local news on television, immediately recognized Green and Coley as the men who had kidnapped, robbed, and shot him.

{¶ 17} At trial, Tyrone Armstrong, a cousin to both Coley and Green, testified that Green and Coley usually carried .25 caliber semiautomatics. Armstrong identified the guns: Green's was pearl-handled, and Coley's had a brown stock. Armstrong also testified that on December 24, 1996, Coley and Green, who spent a lot of time together, were driving around in a blue Taurus sedan. That day, Green made up a rap song with the words "I shot him five times, and he dropped, he tried to run, so I shot him." On January 4 and January 6, 1997, Armstrong saw both Coley and Green driving around in a gray Pontiac 6000 sedan.

{¶ 18} David Cogan, a firearms expert, examined two bullets, one removed from El-Okdi's brain and the other from Moore's wrist, together with three shell casings recovered from the two crime scenes. Cogan concluded that the Raven .25 caliber pistol recovered from the Pontiac's back floor had fired both bullets and had ejected all three shell casings.

{¶ 19} George Cass, an ammunitions expert, concluded that the ammunition that was found in both guns was consistent with the projectiles recovered from Moore and El-Okdi and with shell casings from the crime scenes. The casings were made of the "same case material" and had "identical head stamps." The "live rounds had the identical bullets." These items were also consistent with ammunition originally packed in an empty .25 caliber ammunition box found at Green's home.

{¶ 20} Deborah Angel, a friend of Frusher's, testified that Frusher had problems with drugs and alcohol and exhibited multiple personalities at times. Twelve-year-old Albert Quinn, who was with Frusher on the evening of the El-Okdi shooting, claimed that Frusher had been inside when the shots were fired. Quinn also saw the car in the alley when he and Frusher went outside, and Quinn agreed that the car looked like a photo of El-Okdi's car. Quinn did not see anyone outside the car.

**{¶ 21}** Dr. Jolie Brams, a clinical psychologist and expert in eyewitness identification, described Frusher as a woman who "experiences a range of rather debilitating psychiatric and psychological disorders." Frusher is "severely mentally disabled" and her mental condition makes her "very vulnerable to suggestions." Her mental condition and past abuse of drugs and alcohol "negatively impact[ed] her ability to acquire information * * * in an accurate manner."

**{¶ 22}** The offenses against Moore and El-Okdi were joined. Prior to trial, Green pled guilty to carrying a concealed weapon and to the offenses against Moore. After the trial, a three-judge panel convicted Green of the aggravated murder of Samar El-Okdi, as well as other offenses, and sentenced Green to death. The chart that follows lists all charges, pleas, and the resulting sentences. On the death specifications in Counts IV, V, and VI (later merged), the panel found that prior calculation and design had been proved.

| Charge | Plea | Finding | Sentence |
|---|---|---|---|
| I. Kidnapping of David Moore, R.C. 2905.01(A)(2) | Guilty | Guilty | Ten years |
| II. Aggravated robbery of Moore, R.C. 2911.01(A)(1) | Guilty | Guilty | Ten years |
| III. Attempted murder of Moore, R.C. 2923.02 | Guilty | Guilty | Ten years plus three years actual |
| IV. Aggravated murder of Samar El-Okdi, R.C. 2903.01(A), with R.C. 2929.04(A)(7) death specification | Not Guilty | Guilty | Death |
| V. Aggravated felony murder of El-Okdi, R.C. 2903.01(B), with R.C. 2929.04(A)(7) death specification | Not guilty | Guilty | Merged with IV |

| | | | |
|---|---|---|---|
| VI. Aggravated felony murder of El-Okdi, R.C. 2903.01(B), with R.C. 2929.04(A)(7) death specification | Not guilty | Guilty | Merged with IV |
| VII. Kidnapping of El-Okdi, R.C. 2905.01(A)(2) | Not guilty | Guilty | Ten years |
| VIII. Aggravated robbery of El- Okdi, R.C. 2911.01(A)(1) | Not guilty | Guilty | Ten years plus three years actual |
| IX. Carrying concealed weapon, R.C. 2923.12(A) and (D) | Guilty | Guilty | Eighteen months |
| X. Receiving stolen auto, R.C. 2913.51 | Not guilty | Guilty | Eighteen months |
| XI. Receiving stolen license plate, R.C. 2913.51 and 2913.71(c) | Guilty | Guilty | Twelve months |
| Gun specifications in I, II, and III, R.C. 2941.145 | Guilty | Guilty | Merged into one three-year actual term in III, above |
| Gun specifications in IV through VIII | Not guilty | Guilty | Merged into one three-year actual term in VIII, above |

**{¶ 23}** The cause is now before this court upon an appeal as of right.

————————————

*Julia R. Bates,* Lucas County Prosecuting Attorney, *John J. Weglian* and *Brenda J. Majdalani*, Assistant Prosecuting Attorneys, for appellee.

*Spiros P. Cocoves; David H. Bodiker,* State Public Defender, and *Pamela Prude-Smithers,* Assistant Public Defender, for appellant.

————————————

**PFEIFER, J.**

{¶ 24} In this appeal, Green advances twenty propositions of law. We reject each of the propositions relating to his convictions and therefore affirm his convictions.

{¶ 25} We vacate the death penalty, however, and remand the cause to the trial court for further proceedings, primarily because the trial court failed to comply with Crim.R. 32(A)(1), which requires the trial court in every criminal case to personally address the defendant "and ask if he or she wishes to make a statement on his or her own behalf or present any information in mitigation of punishment." Additionally, we conclude that the trial court's sentencing opinion contains numerous deficiencies. Accordingly, the trial court must reconsider and revise that opinion prior to resentencing Green for the aggravated murder of Samar El-Okdi.

I

Sufficiency of the Evidence

{¶ 26} In his first proposition of law, Green challenges the sufficiency of the evidence to support prior calculation and design, which was charged in Count IV and in the death-penalty specifications in Counts IV, V, and VI.

{¶ 27} We have held that "[t]he relevant inquiry [on appeal] is whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt." *State v. Jenks* (1991), 61 Ohio St.3d 259, 574 N.E.2d 492, paragraph two of the syllabus, following *Jackson v. Virginia* (1979), 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560. "[T]he weight to be given the evidence and the credibility of the witnesses are primarily for the trier of the facts." *State v. DeHass* (1967), 10 Ohio St.2d 230, 39 O.O.2d 366, 227 N.E.2d 212, paragraph one of the syllabus.

{¶ 28} To qualify for the death penalty under R.C. 2929.04(A)(7), the defendant must be the principal offender ("the actual killer," *State v. Penix* [1987], 32 Ohio St.3d 369, 371, 513 N.E.2d 744, 746) or, if not, the trier of fact must find

that the murder was committed with prior calculation and design. *Id.* Here, the trial panel declared that having found prior calculation and design, it need not determine whether Green was the principal offender in the aggravated murder.

{¶ 29} Because the trial panel did not find that Green was the principal offender, *i.e.*, "the actual killer," the sufficiency of the evidence on prior calculation and design will determine whether the death penalty can be imposed in this case. See R.C. 2929.04(A)(7); *State v. Taylor* (1993), 66 Ohio St.3d 295, 306-308, 612 N.E.2d 316, 324-325; *State v. Penix, supra*.

{¶ 30} In 1974, the term "prior calculation and design" replaced the term "deliberate and premeditated malice" in defining aggravated murder in Ohio. 134 Ohio Laws, Part II, 1866, 1900. No bright-line test exists that "emphatically distinguishes between the presence or absence of 'prior calculation and design.' " *State v. Taylor* (1997), 78 Ohio St.3d 15, 20, 676 N.E.2d 82, 89. However, prior calculation and design is a more stringent element than premeditation. *State v. Cotton* (1978), 56 Ohio St.2d 8, 10 O.O.3d 4, 381 N.E.2d 190, paragraph one of the syllabus.

{¶ 31} In this case, the evidence directly establishes how and where El-Okdi was killed, although facts relating to where she was kidnapped and robbed are missing. The evidence supports the trial court's finding that Green was guilty of complicity in her death and thus was one of her killers. When he was arrested, he was driving her car. His constant companion, Coley, possessed the gun that killed her. Green knew where her body could be found. Moreover, just twelve days earlier and a block from where El-Okdi lived, Green and Coley, acting together, had carjacked and robbed David Moore, driven him to a deserted area, shot him several times, and left him for dead.

{¶ 32} Green argues that the state's proof of prior calculation and design rests solely on the supposition that the facts of El-Okdi's kidnapping, robbery, and murder were similar to what we know about the crimes against Moore. He admits

that "other acts" evidence is admissible to establish identity or intent under Evid.R. 404(B). However, he argues that it is impermissible to use other-acts evidence to prove prior calculation and design in a later crime.

{¶ 33} We reject Green's challenge to the sufficiency of the evidence. First, Evid.R. 404(B) recognizes that "other acts" evidence can be admitted to prove, *inter alia*, "intent, *preparation, plan*, knowledge, identity, or absence of mistake or accident." (Emphasis added.) Additionally, prior calculation and design can be found even when the plan to kill was quickly conceived and executed. See *State v. Goodwin* (1999), 84 Ohio St.3d 331, 343-345, 703 N.E.2d 1251, 1263 (store robbery in which one clerk was shot); *State v. Taylor*, 78 Ohio St.3d at 20-23, 676 N.E.2d at 89-91 (two- to three-minute encounter in bar between rivals for another's affections).

{¶ 34} In any event, the known facts of El-Okdi's kidnapping, robbery, and murder by themselves, apart from the Moore crimes, support finding prior calculation and design. For example, El-Okdi was killed in an isolated area and was kidnapped for no apparent reason other than to kill her. El-Okdi was considerably smaller than her two armed killers, and she could not have posed any threat or put up any credible resistance. Nothing in the record suggests that she went to the location where she was killed voluntarily. In fact, El-Okdi had told a friend that she wanted to spend the evening at home alone. Also, El-Okdi was shot at close range, between the eyes, which suggests an execution-style slaying. Frusher testified that the Pontiac's license plate had a zero in it, which means that Green and Coley placed stolen plates on El-Okdi's Pontiac where they killed her. Finally, Green and Coley drove her Pontiac 6000 around town, which suggests a plan both to use her property and deprive her of any way to complain about its use. We reject Green's first proposition of law.

II

Allocution Rights

{¶ 35} In his second proposition of law, Green argues that he was denied due process and his rights under Ohio law because he was "not given an opportunity to speak before the death penalty [was] imposed." Ohio Crim.R. 32(A)(1) confers an absolute right of allocution:

"At the time of imposing sentence, the court shall * * *:

"Afford counsel an opportunity to speak on behalf of the defendant and address the defendant personally and ask if he or she wishes to make a statement in his or her own behalf or present any information in mitigation of punishment." See *State v. Campbell* (2000), 90 Ohio St.3d 320, 738 N.E.2d 1178, paragraph one of the syllabus; *State v. Reynolds* (1998), 80 Ohio St.3d 670, 684, 687 N.E.2d 1358, 1372.

{¶ 36} The state argues that the court asked Green whether he wished to make a statement before imposing sentence. Around 9:25 p.m. on March 11, after hearing the penalty-phase evidence and deliberating for several hours, the panel announced that it was ready to proceed. After noting its previous findings, the court asked whether the defense had any objection to sentencing on the noncapital offenses as well as the capital offenses that evening. The defense had no objection. The following exchange then took place:

"The Court: Is there anything with regard to those offenses, Counsel or Mr. Green, prior to the Court passing sentence on both those counts as well as on Counts 7, 8 and 10?

"Mr. Cameron [defense counsel]: Anything we wish to say?

"The Court: Yes."

{¶ 37} Counsel then commented about sentencing on the firearm specifications, and the court agreed. Counsel said nothing further, and Green said nothing. After Moore, Moore's wife, and Moore's brother made victim impact statements, the court imposed sentences for each offense to which Green pled guilty or was found guilty, including aggravated murder.

**{¶ 38}** The trial court clearly erred in not explicitly asking Green, in an inquiry directed only to him, whether he had anything to say before he was sentenced. The United States Supreme Court has specifically cautioned federal judges under the comparable Federal Rules: "Trial judges before sentencing should * * * unambiguously address themselves to the defendant. * * * [J]udges should leave no room for doubt that the defendant has been issued a personal invitation to speak prior to sentencing." *Green v. United States* (1961), 365 U.S. 301, 305, 81 S.Ct. 653, 655, 5 L.Ed.2d 670, 674.

**{¶ 39}** The trial court's reference to "both those counts" is ambiguous. The context suggests that the court may have solicited comment only on the noncapital offenses. Instead, the trial court should have specifically asked Green if he had anything to say about the capital counts as well as the other offenses. The record demonstrates a violation of Crim.R. 32 that was neither invited nor harmless.

**{¶ 40}** Trial courts must painstakingly adhere to Crim.R. 32, guaranteeing the right of allocution. A Crim.R. 32 inquiry is much more than an empty ritual: it represents a defendant's last opportunity to plead his case or express remorse. "[I]ts legal provenance was the common-law right of allocution." *Green*, 365 U.S. at 304, 81 S.Ct. at 655, 5 L.Ed.2d at 673. See, also, *United States v. Myers* (C.A.5, 1998), 150 F.3d 459, 461-462; *United States v. Riascos-Suarez* (C.A.6, 1996), 73 F.3d 616, 627; Annotation (1964), 96 A.L.R.2d 1292, Section 4.

**{¶ 41}** Green's right of allocution was violated, thereby undercutting the constitutional reliability of this death sentence. Accordingly, we sustain his second proposition of law and remand for resentencing. *Campbell*, 90 Ohio St.3d 320, 738 N.E.2d 1178, paragraph three of the syllabus.

III

Residual Doubt

**{¶ 42}** In his third proposition of law, Green urges that this court to overrule *State v. McGuire* (1997), 80 Ohio St.3d 390, 686 N.E.2d 1112, syllabus ("Residual

doubt is not an acceptable mitigating factor under R.C. 2929.04[B]”).  In support, Green argues that *McGuire* unconstitutionally limits mitigation evidence under the reliability component of the Eighth Amendment and that an accused has a due process right to argue against evidence of guilt that supports the death penalty.

{¶ 43} However, the precedents are clear and contrary to Green’s arguments.  We decline to overrule *State v. McGuire*.  Neither the United States Constitution nor the Constitution of Ohio requires that residual doubt be considered as a mitigating factor.  *Franklin v. Lynaugh* (1988), 487 U.S. 164, 108 S.Ct. 2320, 101 L.Ed.2d 155; *State v. McGuire, supra,* at 402-404, 686 N.E.2d at 1122-1123. We reject Green’s third proposition of law.

IV

Weighing and Determination of the Death Penalty

{¶ 44} In his fourth and fifth propositions of law, Green argues that the trial court’s sentencing opinion was constitutionally deficient because the court improperly weighed the aggravating circumstances that were alleged and proved, improperly considered nonstatutory aggravating circumstances, and failed to consider relevant mitigating evidence.  We agree and sustain his fourth and fifth propositions of law.

{¶ 45} R.C. 2929.03(D)(3) specifies that the death penalty shall be imposed “if the panel of three judges unanimously finds, by proof beyond a reasonable doubt, that the aggravating circumstances the offender was found guilty of committing outweigh the mitigating factors.”  “[T]he ‘aggravating circumstances’ against which the mitigating evidence is to be weighed are limited to the specifications of aggravating circumstances set forth in R.C. 2929.04(A)(1) through (8) that have been alleged in the indictment and proved beyond a reasonable doubt.” *State v. Wogenstahl* (1996), 75 Ohio St.3d 344, 662 N.E.2d 311, paragraph one of the syllabus.  Accord *State v. Johnson* (1986), 24 Ohio St.3d 87, 24 OBR 282, 494

N.E.2d 1061, syllabus; *State v. Cooey* (1989), 46 Ohio St.3d 20, 544 N.E.2d 895, paragraph three of the syllabus.

{¶ 46} When the trial panel imposed the death penalty on Green it violated these principles. For example, the single death-penalty specification in Count IV, aggravated murder with prior calculation and design, as well as the single death specification in Counts V and VI, alleged that Green committed the murder while committing or attempting to commit "kidnapping *or* aggravated robbery."[1] (Emphasis added.) Despite the indictment's clear language, the trial verdict stated that Green committed the murder while committing "*both* a kidnaping *and* an aggravated robbery." (Emphasis added.) The panel's death penalty opinion also altered the aggravating circumstance from that specifically alleged in the indictment, by considering as two separate and distinct aggravating circumstances Green's involvement in committing "both an aggravated robbery and a kidnapping." Moreover, the panel gave weight to *both* kidnapping and aggravated robbery as separate and distinct aggravating circumstances despite the fact that they were not alleged as such. By doing so, the panel wrongfully multiplied a single circumstance into two. See *State v. Spivey* (1998), 81 Ohio St.3d 405, 420, 692 N.E.2d 151, 163, fn. 2; *State v. Davis* (1988), 38 Ohio St.3d 361, 367-373, 528 N.E.2d 925, 931-935.

{¶ 47} The panel made another egregious error by declaring that "the State has proved aggravating circumstances beyond a reasonable doubt under both R.C. 2929.04(A)(3) and (A)(7): that is, that the killing of Samar El-Okdi was for the purpose of escaping detection, apprehension, trial or punishment for another offense committed by Mr. Green." The panel, relying upon the (A)(3) factor in deciding to impose the death penalty, stated: "The killing of Samar El-Okdi was

---

1. The panel correctly merged the aggravated murder charges for a single victim into a single offense for punishment purposes. See *State v. Lawson* (1992), 64 Ohio St.3d 336, 351, 595 N.E.2d 902, 913. Counts V and VI were "merged into [Count IV] as allied offenses of similar import."

planned, calculated and carried out as an execution of a potential witness." In discussing the aggravating circumstances, the panel referred to "the gratuitous, cold, calculating and seemingly remorseless execution of Ms. El-Okdi."

{¶ 48} However, the indictment did not allege a violation of R.C. 2929.04(A)(3), and the parties did not argue the issue. The panel's first reference to this aggravating circumstance was in the penalty opinion, not the guilt-phase verdict. The panel thus violated R.C. 2929.03(D)(3) and *Wogenstahl* by imposing death on the basis of an aggravating circumstance with which Green was never charged. *State v. Baston* (1999), 85 Ohio St.3d 418, 426, 709 N.E.2d 128, 136; *State v. Raglin* (1998), 83 Ohio St.3d 253, 257, 699 N.E.2d 482, 487.

{¶ 49} Third, the trial panel relied on nonstatutory aggravating circumstances in imposing the death penalty. The trial court's sentencing opinion compared and contrasted the Moore offenses with the El-Okdi killing. However, Green was separately sentenced for the offenses against Moore, and no "course of conduct" specification, R.C. 2929.04(A)(5), was charged in this case. While the offenses against Moore helped prove that Green was involved in El-Okdi's murder (see discussion on Green's eleventh proposition of law), they were not relevant to the specified aggravating circumstance or to the decision to impose the death penalty upon Green. For example, the trial court's penalty opinion states:

"The Moore incidents are hauntingly evocative of the facts surrounding the [offenses against El-Okdi]. Both were [carjacked]; both were forced back into their cars at gunpoint; both were then driven to remote alleys, ordered out of their cars, and then shot at point blank range. * * * Green and Coley kept both cars for several days afterwards." * * * Perhaps they had some doubts that they had succeeded in killing Mr. Moore; but there could have been no such doubt as to Ms. El-Okdi. She was shot directly between the eyes at very close range.

" * * *

"[I]t is difficult to imagine a colder or more calculating murder than that of Ms. El-Okdi, or the attempted murder of Mr. Moore. * * * The only purpose of the subsequent kidnapping and ensuing events in each case was to eliminate any possibility of later identification. Each of these offenses taken as a sequence was chilling in the extreme."

{¶ 50} Further, the trial court also improperly used facts about the offenses against El-Okdi as nonstatutory aggravating circumstances. See *Wogenstahl*, 75 Ohio St.3d at 352-355, 662 N.E.2d at 319-321, and at paragraph two of the syllabus; *State v. Davis*, 38 Ohio St.3d at 367-369, 528 N.E.2d at 931-933. Also, the panel's speculation in the sentencing opinion that "it is certainly possible from the evidence that Mr. Green was the shooter" was improper, since the panel did not determine that he was the principal offender. See discussion of Green's first proposition of law.

{¶ 51} Fourth, the court used an improper weighing standard, *i.e.*, the panel found "the cumulative weight of the mitigating factors * * * do not offset the aggravating circumstances * * * proved beyond a reasonable doubt by the State." Before the death penalty can be imposed, R.C. 2929.03(D)(3) specifies that the panel must find, by proof beyond a reasonable doubt, that the aggravating circumstances "outweigh the mitigating factors." Thus, the panel's language obscured the state's burden to prove beyond a reasonable doubt that the aggravating circumstances outweighed mitigating factors. Moreover, the panel's wording, which referred to mitigation "offset[ting]" aggravation, improperly suggested that the defense had the burden of persuasion. See *State v. Hill* (1995), 73 Ohio St.3d 433, 438-439, 653 N.E.2d 271, 278.

{¶ 52} Finally, in his fifth proposition of law, Green asserts that the court did not give appropriate weight to mitigating factors. Admittedly, "the assessment and weight to be given mitigating evidence are matters for the trial court's determination." *State v. Lott* (1990), 51 Ohio St.3d 160, 171, 555 N.E.2d 293, 305.

Accord *State v. Steffen* (1987), 31 Ohio St.3d 111, 31 OBR 273, 509 N.E.2d 383, paragraph two of the syllabus.

{¶ 53} In this case, however, the trial court misinterpreted our decision in *State v. McGuire,* 80 Ohio St.3d 390, 686 N.E.2d 1112, which held that residual doubt was not acceptable as a mitigating factor under R.C. 2929.04(B) in capital cases. Here, the trial court declared that, but for the *McGuire* decision, "the resulting penalty for the capital murder count and specification would have been life without the possibility of parole, instead of death." The trial court then asserted, "Residual doubt as to identity, and to a lesser extent *as to the role played by [Green] in the demise of Ms. El-Okdi*, would have played a pivotal role in this case, based upon the evidence. * * * Unequivocally, for what it is worth, it would have resulted in a different sentence." (Emphasis added.)

{¶ 54} However, the *McGuire* decision does not and was never intended to preclude the appropriate weighing of the evidence and the independent weighing of aggravating circumstances against mitigating factors. Accordingly, the trial panel was able to give whatever weight it thought appropriate to the fact that it did not find that Green was the principal offender in the aggravated murder. Indeed, the fact that a defendant was not the principal offender is a specific statutory mitigating factor. See R.C. 2929.04(B)(6). Normally, it would be a powerful mitigating factor. Very few death sentences have been approved against persons who were not the principal offender. Cf. *State v. Robb* (2000), 88 Ohio St.3d 59, 723 N.E.2d 1019. Yet, in evaluating the evidence, the trial court gave virtually no weight to the fact that Green was not found to be the principal offender in the aggravated murder. Moreover, the court's erroneous reading of our decision in *McGuire* appears to have contributed to this failure.

{¶ 55} Deficiencies in a sentencing opinion can normally be corrected by appellate reweighing. See *State v. Fox* (1994), 69 Ohio St.3d 183, 190-191, 631 N.E.2d 124, 131; *State v. Lott*, 51 Ohio St.3d at 170, 555 N.E.2d at 304. We deem

the deficiencies in this case too severe to correct by simply reevaluating the evidence. In this case, the collective deficiencies in the trial court's decision to impose the death penalty, as reflected in the sentencing opinion, undermine our confidence in that decision. The panel overlooked many of this court's prior decisions and the mandated statutory framework. These cumulative errors reflect grievous violations of the statutory deliberative process. Accordingly, we vacate the death penalty imposed in this case and remand to the trial court for further deliberations. See *State v. Davis*, 38 Ohio St.3d at 372, 528 N.E.2d at 936.

{¶ 56} While revising the sentencing opinion to address the deficiencies noted, the trial court judges on remand must consider whatever Green discusses should he choose to exercise his right to allocution. See discussion on Green's second proposition of law.

V

Victim-Impact Evidence

{¶ 57} In his seventh proposition of law, Green argues that his constitutional rights were violated when Moore's family members asserted that Green should be sentenced to death.

{¶ 58} Following the penalty deliberations, the court asked if it could accelerate sentencing for the Moore offenses, which had been scheduled for the next day. The defense agreed. Then, before the court announced the sentencing decisions for the Moore and El-Okdi offenses, David Moore described the events of his "terrifying" night, as well as the thoughts and emotions engendered by it. He wanted to ensure that "these predators are never allowed to inflict this terror again on anyone else" and expressed his desire that they receive a maximum sentence.

{¶ 59} Moore's wife described her anger, her fear, David Moore's suffering, and the impact of the offenses. She also contrasted the lives of Green and her husband, and commented on the impact that El-Okdi's death had on El-Okdi's family. Mrs. Moore thought that Green lacked remorse and asked, "How

dare this coward [Green] think that he deserves to live when he has taken the life of another[?]"  Paul Moore, David's brother, also spoke about his brother, the impact of the offenses, and the impact that El-Okdi's murder had on El-Okdi's family.  Paul Moore asked the court to "consider the gravity and the cruelty of these crimes and protect us by issuing the harshest penalty available by law."  Defense counsel did not object to these statements.

**{¶ 60}** The United States Constitution does not prohibit victim-impact evidence in capital cases.  *Payne v. Tennessee* (1991), 501 U.S. 808, 111 S.Ct. 2597, 115 L.Ed.2d 720; *State v. Goodwin*, 84 Ohio St.3d at 343, 703 N.E.2d at 1262.  However, neither Ohio's Constitution nor its statutes authorized Moore or his family to speculate about the impact of El-Okdi's murder on El-Okdi's family.  See, *e.g.*, R.C. 2930.14; R.C. 2930.02; cf. *State v. White* (1999), 85 Ohio St.3d 433, 446-447, 709 N.E.2d 140, 154-155.

**{¶ 61}** The trial court should not have permitted Moore or his family members to express opinions about how Green should be punished for the offenses against El-Okdi.  *State v. Huertas* (1990), 51 Ohio St.3d 22, 553 N.E.2d 1058, syllabus ("Expressions of opinion by a witness as to the appropriateness of a particular sentence in a capital case violate the defendant's constitutional right to have the sentencing decision made by the jury and judge").  Accord *State v. Goodwin*, 84 Ohio St.3d at 343, 703 N.E.2d at 1262; *State v. Fautenberry* (1995), 72 Ohio St.3d 435, 439, 650 N.E.2d 878, 882.

**{¶ 62}** Because Green did not object, the issue must be considered on a plain-error basis.  Moreover, judges can normally be presumed not to have relied upon such improper expressions of opinion.  See *State v. Goodwin*, 84 Ohio St.3d at 343, 703 N.E.2d at 1262; *State v. Post* (1987), 32 Ohio St.3d 380, 384, 513 N.E.2d 754, 759.  However, since the trial court's death opinion in this case dwelt at length on the Moore offenses, which were not relevant, that presumption cannot reasonably apply in this case.  In revising their sentencing opinion in this case, the

judges constituting the trial panel should clarify whether or not they considered expressions of opinion from others as to what the sentence should be in this case. We sustain Green's seventh proposition of law.

VI

Pretrial Issues

{¶ 63} **Procedures on arrest.** In his eighth proposition of law, Green argues that he was arrested without a warrant on January 7, 1997, that he was not promptly taken before a magistrate for a probable cause determination, and therefore that "all fruits of the warrantless arrest must be suppressed." We find that Green's arguments lack merit.

{¶ 64} Green's claim that he first appeared in court on January 15, eight days after his arrest, is wrong. On January 8, Green appeared in Toledo Municipal Court for a preliminary hearing, which is a probable cause determination. R.C. 2937.09. He was charged with carrying a concealed weapon and receiving stolen property. A video of that court appearance is in the record.

{¶ 65} As Green did not complain at trial about the failure to conduct a prompt preliminary hearing, he waived the issue. See *State v. Campbell* (1994), 69 Ohio St.3d 38, 44, 630 N.E.2d 339, 347; *State v. F.O.E. Aerie 2295* (1988), 38 Ohio St.3d 53, 526 N.E.2d 66, paragraph two of the syllabus; *State v. Wade* (1978), 53 Ohio St.2d 182, 7 O.O.3d 362, 373 N.E.2d 1244, paragraph three of the syllabus. We reject Green's eighth proposition of law.

{¶ 66} **Suppression of pretrial statements.** In his ninth proposition of law, Green argues that his *Miranda* waiver and pretrial statements to police were coerced. Green argues that sleep deprivation overcame his will because he was questioned for over twelve hours without rest.

{¶ 67} In determining whether a confession is involuntary, a court "should consider the totality of the circumstances, including the age, mentality, and prior criminal experience of the accused; the length, intensity, and frequency of

20

interrogation; the existence of physical deprivation or mistreatment; and the existence of threat or inducement." *State v. Edwards* (1976), 49 Ohio St.2d 31, 3 O.O.3d 18, 358 N.E.2d 1051, paragraph two of the syllabus. See *State v. Brewer* (1990), 48 Ohio St.3d 50, 58, 549 N.E.2d 491, 499; *State v. Barker* (1978), 53 Ohio St.2d 135, 7 O.O.3d 213, 372 N.E.2d 1324. The same considerations apply to whether Green voluntarily waived his rights.

{¶ 68} The evidence supports a finding that Green voluntarily waived his *Miranda* rights both verbally and in writing and voluntarily talked with police. Green acknowledged that he understood his rights and he in fact waived them on at least three separate occasions. Green was arrested around 1:45 a.m. on January 7, 1997. He was first questioned at 5:04 a.m. when he was advised of and waived his *Miranda* rights. He told police that a "dope fiend" rented him the car, so detectives drove him around town looking for this person. Around 10:30 a.m., Green again signed a waiver of *Miranda* rights. Around 2:30 p.m., police again advised Green of his *Miranda* rights and Green signed another waiver. Around 4:30 p.m., Green claimed in a taped statement that Coley told him that he had shot a woman and stolen her car. Green denied that he was involved in this crime.

{¶ 69} No evidence suggests that police physically abused Green, threatened him, or made any promises during questioning. Green was eighteen years old when questioned. Interviews were sporadic, not continuous, and Green was given food and breaks. Green never refused to answer questions, never asked for questioning to stop, and never asked for medical attention or a lawyer. Green did not complain that he was tired, nor does any evidence indicate that he was tired.

{¶ 70} The length and intensity of the questioning did not overcome his will. See *State v. Barker*, 53 Ohio St.2d at 141, 7 O.O.3d at 217, 372 N.E.2d at 1329-1330. Instead, Green maintained his claim that he did not kidnap, rob, or kill El-Okdi but simply drove her car after she was killed. The record supports the trial court's decision to reject the suppression motion. As *State v. Fanning* (1982), 1

21

Ohio St.3d 19, 20, 1 OBR 57, 58, 437 N.E.2d 583, 584, held, "the weight of the evidence and credibility of witnesses are primarily for the trier of the facts. * * * This principle is applicable to suppression hearings as well as trials." Accord *State v. DeHass*, 10 Ohio St.2d 230, 39 O.O.2d 366, 227 N.E.2d 212, paragraph one of the syllabus; *State v. DePew* (1988), 38 Ohio St.3d 275, 277, 528 N.E.2d 542, 547. We reject Green's ninth proposition of law.

{¶ 71} **Waiver of jury trial.** In his tenth proposition of law, Green argues that his jury trial waiver was not knowing, intelligent, and voluntary because the trial court did not explain "all of the implications of that waiver including the limited right to appeal erroneous rulings by the three-judge panel."

{¶ 72} However, a "trial court is not required to inform the defendant of all the possible implications of waiver [of trial by jury]." *State v. Bays* (1999), 87 Ohio St.3d 15, 20, 716 N.E.2d 1126, 1135, citing *State v. Jells* (1990), 53 Ohio St.3d 22, 559 N.E.2d 464, paragraph one of the syllabus. Accord *State v. Filiaggi* (1999), 86 Ohio St.3d 230, 238, 714 N.E.2d 867, 875; *State v. Baston*, 85 Ohio St.3d at 421, 709 N.E.2d at 132. The trial court discussed with Green his right to a jury trial, including the role of fact-finding and the requirement of unanimity, and the court determined that Green had fully discussed with counsel his decision to waive a jury. The trial court did not mislead or misinform Green about his rights. Green signed the waiver in open court and it was filed. We reject Green's tenth proposition of law. *State v. Jells*, 53 Ohio St.3d 22, 559 N.E.2d 464, paragraph one of the syllabus; *State v. Baston*, 85 Ohio St.3d at 422, 709 N.E.2d at 133; *State v. Filiaggi*, 86 Ohio St.3d at 238, 714 N.E.2d at 875.

{¶ 73} **Disqualification of trial judge.** In his twelfth proposition of law, Green argues constitutional error because Judge J. Ronald Bowman, who sat on the three-judge panel trying Green, conducted an *ex parte* pretrial certification hearing under Crim.R. 16(B)(1)(e), which restricted disclosure to the defense of the name

of Tyrone Armstrong, a prosecution witness. However, neither constitutional nor prejudicial error occurred.

**{¶ 74}** "The judge who disposes of such a motion [under Crim.R. 16(B)(1)(e)] may not be the same judge who will conduct the trial," *State v. Gillard* (1988), 40 Ohio St.3d 226, 533 N.E.2d 272, paragraph one of the syllabus, because "there is an unnecessary risk that the judge will harbor a bias against that defendant." *Id.* at 229, 533 N.E.2d at 276. Although Judge Bowman did not "conduct the trial," he did sit on the panel. Such a mistake "is not *per se* prejudicial," *id.*, nor is "violation of the *Gillard* rule [a] constitutional error." *State v. Esparza* (1996), 74 Ohio St.3d 660, 662, 660 N.E.2d 1194, 1196.

**{¶ 75}** The fact that Judge Bowman had earlier ruled on the prosecutor's Crim.R. 16(B)(1)(e) certification and later sat on the panel was harmless error. The hearing relating to Tyrone Armstrong was brief. It dealt with Armstrong's family relationship with Coley and Green, as cousins, the fact that all were incarcerated in the same facility, and the fact that family members had asked Armstrong not to cooperate with the prosecution. Moreover, much of Armstrong's testimony dealt with the Moore offenses, to which Green had pled guilty.

**{¶ 76}** With respect to the offenses against El-Okdi, Armstrong simply corroborated that Green was riding in El-Okdi's car for two or three days before he was arrested. Green readily admitted that fact to detectives. The record does not suggest that the trial panel relied upon or considered the brief statements made at the pretrial Crim.R. 16 hearing. See *State v. Post,* 32 Ohio St.3d at 384, 513 N.E.2d at 759. We find any error to be harmless and reject Green's twelfth proposition of law. Cf. *State v. Gillard*, 40 Ohio St.3d at 229-230, 533 N.E.2d at 277.

**{¶ 77} Denial of continuance.** In his fourteenth proposition of law**,** Green argues that he was denied due process and the effective assistance of counsel when the trial court failed to grant a continuance because his counsel did not have adequate time to prepare for trial.

**{¶ 78}** The United States Supreme Court has stated that "[t]here are no mechanical tests for deciding when a denial of a continuance is so arbitrary as to violate due process. The answer must be found in the circumstances * * *, particularly in the reasons presented [when] the request is denied." *Ungar v. Sarafite* (1964), 376 U.S. 575, 589, 84 S.Ct. 841, 850, 11 L.Ed.2d 921, 931. In *State v. Landrum* (1990), 53 Ohio St.3d 107, 115, 559 N.E.2d 710, 722, we recognized that "[s]everal factors can be considered: the length of delay requested, prior continuances, inconvenience, the reasons for the delay, whether the defendant contributed to the delay, and other relevant factors."

**{¶ 79}** In fact, "[t]he grant or denial of a continuance is a matter that is entrusted to the broad, sound discretion of the trial judge." *State v. Unger* (1981), 67 Ohio St.2d 65, 21 O.O.3d 41, 423 N.E.2d 1078, syllabus. We have sustained trial judges in several capital cases who denied continuances despite defense claims that it needed more time to prepare. See, *e.g.*, *State v. Mason* (1998), 82 Ohio St.3d 144, 154-156, 694 N.E.2d 932, 947; *State v. Spirko* (1991), 59 Ohio St.3d 1, 17-18, 570 N.E.2d 229, 249; *State v. Landrum,* 53 Ohio St.3d at 115-116, 559 N.E.2d at 721-722.

**{¶ 80}** The record supports finding that the trial court did not abuse its discretion. Defense counsel Ronnie Wingate represented Green in January 1997 on the original noncapital indictment. On March 10, 1997, Green was indicted on capital charges. The next day, Wingate appeared at a hearing on Green's behalf. Thereafter, Wingate and Donald Cameron, who were the counsel at trial, represented Green at pretrial hearings or conferences in 1997 on March 12, July 17, August 5, August 12, September 16, September 18, October 9, October 15, and in 1998, on January 6, February 13, and February 23. Trial began on February 24, 1998. The trial date for September 8, 1997, had been reset for October 27, 1997, and trial was again continued until February 23, 1998.

**{¶ 81}** Thus, counsel had nearly one year to prepare for trial and sentencing. Although counsel claimed that they needed more time, their claims were not specific. Another claim made by counsel, that they needed a continuance because of exculpatory evidence, could reasonably have been found not credible by the trial court in its discretion.

**{¶ 82}** Counsel presented a strong and specific defense based on the lack of physical and testimonial evidence tying Green to the offenses against El-Okdi. In the penalty phase, counsel presented several witnesses including a defense psychologist. The record shows "strong, vigorous, and competent" representation at all stages of the trial. See *State v. Ballew* (1996), 76 Ohio St.3d 244, 256, 667 N.E.2d 369, 381. No basis exists to find ineffective representation or an abuse of discretion by the trial court in denying a continuance. See *State v. Mason*, 82 Ohio St.3d at 155, 694 N.E.2d at 947; *State v. Spirko*, 59 Ohio St.3d at 17, 570 N.E.2d at 249. We reject Green's fourteenth proposition of law.

VII

Trial Issues

**{¶ 83} "Other acts" evidence.**  In his eleventh proposition of law, Green argues that improper evidence of other criminal acts, namely, evidence that he kidnapped, robbed, and shot Moore, denied Green due process, a fair trial, and a reliable sentencing determination.  Green also argues that this "other acts" evidence mostly concerned wrongdoing by Coley, not him.

**{¶ 84}** Under Evid.R. 404(B), "[e]vidence of other crimes, wrongs, or acts is not admissible to prove" a defendant's character as to criminal propensity.  "It may, however, be admissible * * * [to show] motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident."  *Id.*  "[T]he standard for determining admissibility of such evidence is strict."  *State v. Broom* (1988), 40 Ohio St.3d 277, 533 N.E.2d 682, paragraph one of the syllabus.

**{¶ 85}** "Other acts forming a unique, identifiable plan of criminal activity are admissible to establish identity under Evid.R. 404(B)."  *State v. Jamison* (1990), 49 Ohio St.3d 182, 552 N.E.2d 180, syllabus.  In order "[t]o be admissible to prove identity through a certain *modus operandi*, other-acts evidence must be related to and share common features with the crime in question."  *State v. Lowe* (1994), 69 Ohio St.3d 527, 634 N.E.2d 616, paragraph one of the syllabus.  Additionally, "[t]he admission or exclusion of relevant evidence rests within the sound discretion of the trial court."  *State v. Sage* (1987), 31 Ohio St.3d 173, 31 OBR 375, 510 N.E.2d 343, paragraph two of the syllabus.

**{¶ 86}** In this case, the trial court did not abuse its discretion in admitting evidence of the crimes against Moore to help prove the offenses against El-Okdi.  First, no issue existed as to Green's responsibility for the offenses against Moore.  Moore positively identified Green, and Green pled guilty to those offenses.

**{¶ 87}** Green is mistaken when he argues that he was only a minor participant in these offenses.  According to Moore, Green was the first person to

approach him. Then Green and Coley displayed guns and both forced him in the car. Green told Moore not to look at their faces and told Moore, "Don't try an escape or I'll kill you." Green also told Moore, "Cough up the cash." Finally, Green was the one who chased Moore and shot him several times.

{¶ 88} Second, the offenses against Moore showed a "unique, identifiable plan of criminal activity" helping to prove Green's identity as one who kidnapped, robbed, and killed El-Okdi. That evidence also relates to Green's intent and his plans and preparation under Evid.R. 404(B). In other cases, we have upheld similar "other acts" evidence. See, *e.g.*, *State v. Bey* (1999), 85 Ohio St.3d 487, 709 N.E.2d 484 (both victims stabbed in chest, their trousers removed, and shoes placed next to bodies); *State v. Williams* (1995), 73 Ohio St.3d 153, 652 N.E.2d 721 (same gun used to kill cab driver and assault truck driver); *State v. Woodard* (1993), 68 Ohio St.3d 70, 623 N.E.2d 75 (carjacking attempt admissible to prove identity as to later carjacking and murder); *State v. Jamison*, 49 Ohio St.3d 182, 552 N.E.2d 180 (similar strong-arm robberies against small businesses).

{¶ 89} Here, the similarities between the offenses are remarkable. Moore and El-Okdi lived within a block of each other. Within a twelve-day period, both were carjacked and kidnapped sometime between 7:30 and 8:30 p.m. In both cases, the victims were robbed and taken in their older model cars to a remote area and shot. Based on the bullets from the victims, and the shells from the scene, both were shot by the same gun and the same type of bullets. Both Coley and Green drove their victims' cars after the carjackings using stolen license plates. Thus, the trial court did not abuse its discretion. Cf. *State v. Bey*, 85 Ohio St.3d 487, 709 N.E.2d 484; *State v. Williams*, 73 Ohio St.3d 153, 652 N.E.2d 721. We reject Green's eleventh proposition of law.

{¶ 90} **Off-the-record hearing.** In his thirteenth proposition of law, Green argues that the trial court erred by finding a witness competent to testify based on an off-the-record hearing.

{¶ 91} Contrary to Green's claims, the trial court did not conduct an off-the-record competency hearing. In October 1997, the state took Frusher's deposition. On February 25, 1998, during trial, Green moved to inspect Frusher's psychiatric records and for a judicial determination of her competency. The court declined to order a hearing on Frusher's competency, noting that Frusher had seemed competent when the court had presided over her deposition. The defense stressed that it needed access to Frusher's medical records not to challenge her competency, but to explore "her state of mind at the time she allegedly made these observations" in the alley the night of El-Okdi's murder.

{¶ 92} Later, the court noted that it had interviewed Frusher along with the prosecutor and defense counsel off the record to ascertain "where she [was] treated" and "whether or not she was willing to sign a Medical Information Release." The court noted that Frusher reluctantly signed a release. The parties agreed that defense counsel could have access to the medical records before their cross-examination. Then, before Frusher testified, the court noted that based on its observations when Frusher was deposed and upon the court's "off-the-record interview of Ms. Frusher a half an hour or so ago, the Medical Information Release and the course of the treatment * * * she is competent to testify." Green did not challenge that decision.

{¶ 93} Counsel consented to this informal procedure and apparently never asked for the accused or a court reporter to be present. Defense counsel's agreement to this procedure and failure to request that the interview be recorded waived all but plain error. See *State v. Palmer*, 80 Ohio St.3d at 554, 687 N.E.2d at 696-697; *State v. Williams* (1977), 51 Ohio St.2d 112, 5 O.O.3d 98, 364 N.E.2d 1364. Moreover, a defendant's absence from a witness competency hearing is not a fatal error. *Kentucky v. Stincer* (1987), 482 U.S. 730, 107 S.Ct. 2658, 96 L.Ed.2d 631. We reject Green's thirteenth proposition of law.

{¶ 94} **Absence of accused during proceedings.** In his fifteenth proposition of law, Green argues that the trial court's failure to secure Green's presence at various in-chambers conferences violated his rights to confrontation and due process. Green was absent from a pretrial discussion regarding a continuance, a jury view, and stipulations about evidence, from the interview with Frusher about waiving her medical privilege, from a discussion over a continuance request and possible exculpatory evidence, from a discussion over a continuance request, police reports, hearsay, and defense efforts to locate witnesses, from a discussion over scheduling, possible witnesses, and Frusher's psychiatric records, and from other discussions about Frusher's medical records and scheduling.

{¶ 95} Green has a fundamental right to be present at all stages of his criminal trial. Section 10, Article I, Ohio Constitution; Crim.R. 43(A). An accused's absence, however, does not necessarily result in prejudicial or constitutional error.

{¶ 96} In *Snyder v. Massachusetts* (1934), 291 U.S. 97, 107-108, 54 S.Ct. 330, 333, 78 L.Ed. 674, 679, the court held that "the presence of a defendant is a condition of due process to the extent that a fair and just hearing would be thwarted by his absence, and to that extent only." In *United States v. Gagnon* (1985), 470 U.S. 522, 105 S.Ct. 1482, 84 L.Ed.2d 486, the Supreme Court held that a defendant's absence from a hearing involving a juror, when counsel were present, did not offend due process. See *Kentucky v. Stincer*, 482 U.S. 730, 107 S.Ct. 2658, 96 L.Ed.2d 631 (no Due Process or Confrontation Clause violation when an accused was excluded from a hearing on the competency of two child witnesses). See, also, *State v. Williams* (1983), 6 Ohio St.3d 281, 285-287, 6 OBR 345, 348-350, 452 N.E.2d 1323, 1329-1331; *State v. Roe* (1989), 41 Ohio St.3d 18, 27, 535 N.E.2d 1351, 1362. See, also, Fed.R.Crim.P. 43(c)(3) (accused need not be present at "a conference or hearing upon a question of law").

**{¶ 97}** Although the number of Green's absences from in-chambers conferences is disturbing, the absences did not thwart a fair and just hearing. *Snyder, supra*. Counsel were present and fully participated. At the conferences, the panel never received testimony or evidence. Cf. *State v. Taylor*, 78 Ohio St.3d at 24, 676 N.E.2d at 92. The discussions mostly involved legal issues within the professional competence of counsel, not issues that Green must personally decide. Cf. *United States v. Brown* (C.A.6, 1978), 571 F.2d 980, 987 (accused must establish prejudice from absence at in-chambers conference); *State v. White* (1998), 82 Ohio St.3d 16, 26, 693 N.E.2d 772, 781 (accused's absence during hearing on proposed jury instructions did not deprive him of fair trial); *State v. Williams*, 6 Ohio St.3d at 285-287, 6 OBR at 348-350, 452 N.E.2d at 1329-1331.

**{¶ 98}** Moreover, Green's counsel expressly waived Green's presence at these discussions. See *United States v. Gagnon*, 470 U.S. at 528, 105 S.Ct. at 1485, 84 L.Ed.2d at 491 (trial court "need not get an express 'on the record' waiver from the defendant for every trial conference which a defendant may have a right to attend"); *United States v. Gallego* (C.A.2, 1999), 191 F.3d 156, 171-172 (waiver can be inferred from accused's failure to object to exclusion); *Polizzi v. United States* (C.A.2, 1991), 926 F.2d 1311, 1322-1323 (counsel can waive accused's right to be present); *State v. Hill*, 73 Ohio St.3d at 444, 653 N.E.2d at 281. Thus, we reject the fifteenth proposition of law.

**{¶ 99} Prosecutorial misconduct.** In his sixteenth proposition of law, Green argues that the prosecutor withheld exculpatory evidence, advised witnesses not to talk to defense counsel, and improperly argued the case at both phases of the trial.

**{¶ 100}** *Exculpatory evidence.* Despite Green's claims, the state did not violate *Brady v. Maryland* (1963), 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215, by withholding exculpatory evidence. The evidence in question was a police report on a prior domestic violence complaint by Penny Graves against Coley and certain

pretrial statements by Tyrone Armstrong. Since the reports were "presented *during* the trial [and not after the trial, as in *Brady*], there exists no *Brady* violation." (Emphasis *sic*.) *State v. Wickline* (1990), 50 Ohio St.3d 114, 116, 552 N.E.2d 913, 917; *State v. Brown* (1996), 112 Ohio App.3d 583, 595, 679 N.E.2d 361, 369.

{¶ 101} Moreover, these reports were neither material nor exculpatory. Green has not met the *Brady* materiality test that "had the evidence been disclosed to the defense, the result of the proceeding would have been different." *United States v. Bagley* (1985), 473 U.S. 667, 682, 105 S.Ct. 3375, 3383, 87 L.Ed.2d 481, 494. See, *e.g.*, *State v. Lawson* (1992), 64 Ohio St.3d 336, 343, 595 N.E.2d 902, 908; *State v. Waddy* (1992), 63 Ohio St.3d 424, 433, 588 N.E.2d 819, 827. The panel declined to find that Green was the principal offender, and whether Coley had previously misplaced a firearm or had admitted to shooting El-Okdi did not negate Green's complicity. Moreover, Armstrong's testimony mostly related to offenses against Moore to which Green pled guilty.

{¶ 102} *Interference with access.* Green argues that the state interfered with defense access to witnesses by advising twelve-year-old Albert Quinn not to talk with defense counsel before trial unless a prosecutor was present. However, Quinn did not remember what was said or who said it. The state claims to have told Quinn only that he did not have to talk with defense counsel if he did not want to do so. See *State v. Zeh* (1987), 31 Ohio St.3d 99, 31 OBR 263, 509 N.E.2d 414, paragraph one of the syllabus. Regardless of what was said, Green has not established prejudice from any asserted constitutional violation. Green called Quinn as a defense witness and had complete access to the witness at that time. Cf. *State v. Scudder* (1994), 71 Ohio St.3d 263, 271-272, 643 N.E.2d 524, 531-532.

{¶ 103} *Trial-phase argument.* Green argues that the prosecutor improperly argued Green's guilt. However, "the touchstone of due process analysis in cases of alleged prosecutorial misconduct is the fairness of the trial, not the culpability of the prosecutor." *Smith v. Phillips* (1982), 455 U.S. 209, 219, 102

S.Ct. 940, 947, 71 L.Ed.2d 78, 87. The Constitution does not guarantee "an error-free, perfect trial." *United States v. Hasting* (1983), 461 U.S. 499, 508, 103 S.Ct. 1974, 1980, 76 L.Ed.2d 96, 106.

{¶ 104} At trial, Green failed to object to the remarks he now complains about. Thus, he waived all but plain error. *State v. Wade*, 53 Ohio St.2d 182, 7 O.O.3d 362, 373 N.E.2d 1244, paragraph one of the syllabus; Crim.R. 52(B). Moreover, "[n]either alone nor in the aggregate did these [asserted] errors have an arguable effect on the outcome of the trial." *State v. Slagle* (1992), 65 Ohio St.3d 597, 605, 605 N.E.2d 916, 925.

{¶ 105} The prosecutor's remarks about "senseless violence" or that Green's crimes were "heinous" were inconsequential. The prosecutor did not err by arguing that the facts of the Moore crime showed prior calculation and design for the El-Okdi murder. Evid.R. 404(B) permits proof of other acts to show "intent, preparation [or] plan." See discussion on Green's eleventh proposition of law. Nor did the prosecutor err by commenting on Green's demeanor, body language, and lack of any concern during trial. See, *e.g.*, *State v. Bey*, 85 Ohio St.3d at 496-497, 709 N.E.2d at 495 (state can comment on accused's emotional outburst during argument); *State v. Brown* (1988), 38 Ohio St.3d 305, 317, 528 N.E.2d 523, 538 (state "may comment on the accused's appearance").

{¶ 106} The prosecutor properly argued that Frusher was a reliable witness to the simple events she witnessed, that she lacked any motive to lie, and that her testimony was not contradictory. The state did not improperly vouch for her as a witness. Instead, the prosecutor argued facts to support Frusher's credibility and responded to defense attacks on her credibility and mental abilities. See, *e.g.*, *State v. Goodwin*, 84 Ohio St.3d at 339, 703 N.E.2d at 1260; *State v. Woodard*, 68 Ohio St.3d at 76, 623 N.E.2d at 80.

{¶ 107} The prosecutor's comment that if Green "wanted to take your car from you he would not hesitate in killing you to take it," was simple hyperbole that

can be disregarded. Likewise, the prosecutor's brief comment about what El-Okdi was thinking as she lay dying was improper but not prejudicial. Cf. *State v. Combs* (1991), 62 Ohio St.3d 278, 282-283, 581 N.E.2d 1071, 1076-1077; *State v. Wogenstahl*, 75 Ohio St.3d at 357-360, 662 N.E.2d at 322-324. Finally, "[j]udges are trained and expected to disregard any extraneous influences in deliberations." *State v. Davis* (1992), 63 Ohio St.3d 44, 48, 584 N.E.2d 1192, 1196. Accord *State v. Post*, 32 Ohio St.3d at 384, 513 N.E.2d at 759.

**{¶ 108}** *Penalty phase.* The prosecutor did not err by asking the defense psychologist, Dr. Jolie Brams, if the antisocial personality disorder classification also encompassed psychopaths and sociopaths. The question and Dr. Brams's affirmative answer merely provided a context for her opinions. Green's failure to object waived all but plain error. *State v. Williams*, 51 Ohio St.2d 112, 5 O.O.3d 98, 364 N.E.2d 1364.

**{¶ 109}** Further, Green argues that the prosecutor's sentencing argument stressed the manner of killing, pointed to the lack of justification, and exaggerated the relatively minor role Green played in killing El-Okdi. Green's failure to object waived these issues. *State v. Wade*, 53 Ohio St.2d 182, 7 O.O.3d 362, 373 N.E.2d 1244, paragraph one of the syllabus; Crim.R. 52(B).

**{¶ 110}** Moreover, "[p]rosecutors can urge the merits of their cause and legitimately argue that defense mitigation evidence is worthy of little or no weight." *State v. Wilson* (1996), 74 Ohio St.3d 381, 399, 659 N.E.2d 292, 309. See, also, *State v. Steffen*, 31 Ohio St.3d 111, 31 OBR 273, 509 N.E.2d 383, paragraph two of the syllabus. As we noted in *State v. Hill* (1996), 75 Ohio St.3d 195, 200, 661 N.E.2d 1068, 1075, "both the criminal *and his crime* are properly considered in determining the propriety of imposing a death sentence." (Emphasis *sic*.) The facts are relevant in determining whether the nature and circumstances of the offense are mitigating. *State v. Lorraine* (1993), 66 Ohio St.3d 414, 420, 613 N.E.2d 212, 218.

See, also, *State v. Stumpf* (1987), 32 Ohio St.3d 95, 512 N.E.2d 598, paragraph one of the syllabus.

{¶ 111} Finally, misconduct by the prosecutor did not permeate the trial. Considering all the circumstances, Green received a fair trial. Cf. *State v. Hill*, 75 Ohio St.3d at 201-202, 661 N.E.2d at 1076-1077; *State v. Landrum*, 53 Ohio St.3d at 110, 559 N.E.2d at 718. We reject Green's sixteenth proposition of law.

{¶ 112} *Advice on right to testify.* In his seventeenth proposition of law, Green argues that the trial court violated Green's constitutional rights by failing to ask Green whether he knew he had a right to testify and inquire whether "he knowingly, intelligently and voluntarily waives that right." However, "a trial court is not *required* to conduct an inquiry with the defendant concerning the decision whether to testify in his defense." (Emphasis *sic.*) *State v. Bey*, 85 Ohio St.3d at 499, 709 N.E.2d at 497. Accord *State v. Madrigal* (2000), 87 Ohio St.3d 378, 398, 721 N.E.2d 52, 71; *State v. Filiaggi*, 86 Ohio St.3d at 240-241, 714 N.E.2d at 877. As in *Bey*, nothing in the record suggests that Green "wanted to testify and was denied the opportunity to do so." 85 Ohio St.3d at 500, 709 N.E.2d at 497. We reject Green's seventeenth proposition of law.

{¶ 113} *Ineffective assistance of counsel.* In his eighteenth proposition of law, Green argues that his counsel provided ineffective assistance both before and during the trial. Reversal of convictions on ineffective assistance requires that the defendant show, first, that counsel's performance was deficient and, second, that the deficient performance prejudiced the defense so as to deprive the defendant of a fair trial. *Strickland v. Washington* (1984), 466 U.S. 668, 687, 104 S.Ct. 2052, 2064, 80 L.Ed.2d 674, 683. Accord *State v. Bradley* (1989), 42 Ohio St.3d 136, 538 N.E.2d 373.

{¶ 114} Green argues that his attorneys did not advise him about certain rights. Since the record does not reflect what Green's counsel advised him, we are unable to determine whether Green's attorneys failed to advise him about the

34

differences between a jury and panel trial, his right to be present at in-chambers conferences, his right to testify, or his right to allocution. The record also does not show that counsel failed to adequately prepare for trial. We summarily reject these claims. See *State v. Ishmail* (1978), 54 Ohio St.2d 402, 8 O.O.3d 405, 377 N.E.2d 500, paragraph one of the syllabus (reviewing court cannot decide appeal based on matters not in the record); *State v. Williams*, 73 Ohio St.3d at 160, 652 N.E.2d at 728 (same).

{¶ 115} Second, Green has not demonstrated that his counsel's performance fell "below an objective standard of reasonable representation." *State v. Bradley*, 42 Ohio St.3d 136, 538 N.E.2d 373, paragraph two of the syllabus. "[A] court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." *Strickland*, 466 U.S. at 689, 104 S.Ct. at 2065, 80 L.Ed.2d at 694.

{¶ 116} Counsel need not raise issues lacking merit. *State v. Hill*, 75 Ohio St.3d at 211, 661 N.E.2d at 1083. Since Green was brought promptly before a magistrate, counsel cannot be faulted for failing to claim otherwise. Similarly, since there was no off-the-record competency evaluation of Frusher, counsel were not required to raise the nonexistent evaluation as an issue. Counsel need not raise weak claims of prosecutorial misconduct. Ohio's statutory "reasonable doubt" definition is proper, as was the admission of trial-phase evidence into the penalty phase. Counsel need not challenge such decisions. See *State v. DePew*, 38 Ohio St.3d 275, 528 N.E.2d 542, paragraph one of the syllabus, and discussion on Green's other propositions of law.

{¶ 117} We cannot find counsel ineffective for failing to challenge Judge Bowman because he presided over the *ex parte* hearing regarding Tyrone Armstrong. It is possible that counsel wanted Judge Bowman to sit even though he had participated in a pretrial hearing under Crim.R. 16(B)(1)(e). Finally, counsel's argument, in support of an acquittal on the "principal offender" element, that the

state failed to prove intent to kill could have perhaps been clearer, but that does not constitute deficient performance. In sum, counsel acted within their reasonable professional judgment.

{¶ 118} Green also complains that counsel should have objected to the panel's finding on the R.C. 2929.03(A)(7) death specification and to the victim-impact statements. Our disposition vacating the death penalty and remanding the cause renders those issues moot. We reject Green's eighteenth proposition of law.

VIII

Constitutional Issues

{¶ 119} In his nineteenth proposition of law, Green argues that his rights were violated because of Ohio's statutory definition of reasonable doubt. However, nothing in the record demonstrates that the three-judge panel relied upon a constitutionally deficient standard. Moreover, Ohio's statutory definition of reasonable doubt is constitutional. See *State v. Lundgren* (1995), 73 Ohio St.3d 474, 493, 653 N.E.2d 304, 323; *State v. Van Gundy* (1992), 64 Ohio St.3d 230, 594 N.E.2d 604. Accord *Victor v. Nebraska* (1994), 511 U.S. 1, 114 S.Ct. 1239, 127 L.Ed.2d 583. We reject Green's nineteenth proposition of law.

{¶ 120} We summarily reject Green's twentieth proposition of law, which challenges the constitutionality of Ohio's death penalty statute. See *State v. Poindexter* (1988), 36 Ohio St.3d 1, 520 N.E.2d 568, syllabus; *State v. Smith* (1997), 80 Ohio St.3d 89, 684 N.E.2d 668, paragraph one of the syllabus; *State v. Goodwin*, 84 Ohio St.3d at 349-350, 703 N.E.2d at 1267.

IX

Sentence Appropriateness

{¶ 121} Green's sixth proposition of law, which argues that the death penalty is not warranted in his case, is mooted by our disposition. Our sentence evaluation and issues of proportionality are also mooted.

X

Disposition

{¶ 122} We affirm each of Green's convictions and the sentences on the noncapital offenses. We reverse the sentence of death and remand the cause for further proceedings consistent with this opinion. See *State v. Davis*, 38 Ohio St.3d 361, 528 N.E.2d 925.

*Judgment affirmed in part,*

*reversed in part*

*and cause remanded.*

MOYER, C.J., COOK and LUNDBERG STRATTON, JJ., concur.

COOK and LUNDBERG STRATTON, JJ., concur separately.

F.E. Sweeney, J., concurs in judgment.

DOUGLAS, J., concurs in part and dissents in part.

DOUGLAS and RESNICK, JJ., dissent.

_____

**COOK, J., concurring.**

{¶ 123} I agree with the majority's decision to vacate Green's death sentence and to remand the cause to the trial court. I write separately to (1) bolster the record support for the allocution decision in Part II of the majority opinion and (2) disagree with the language in Part V that suggests that trial courts must explicitly reject, in sentencing opinions, all inadmissible evidence.

1

{¶ 124} In Part II, the majority cites a portion of the sentencing-phase transcript and determines that when the panel asked Green if there was anything he wished to say "with regard to those offenses," the context of that question *"suggests* that the court *may* have solicited comment only on the noncapital offenses." (Emphasis added.) A review of the sentencing-phase transcript as a whole confirms, *without a doubt*, that the panel never invited Green to speak on his own behalf or present information in mitigation of punishment for the capital offenses in this case.

{¶ 125} The transcript shows that the panel retired to consider the aggravating and mitigating circumstances at 5:18 p.m. Later that evening, the panel returned to announce its verdict and sentence Green. First, the panel noted that it had previously found Green guilty of the aggravated murder charges and accompanying capital specifications in Counts 4, 5, and 6. The panel then noted that it had previously found Green guilty of the noncapital offenses in Counts 1, 2, 3, 7, 8, 9, 10, and 11. The panel's next statement, not cited by the majority, was the following: "*Proceeding then with the non-capital sentencing first*, then, this panel inquires whether the Defendant has any objection to accelerating *sentencing as to Counts 1, 2, 3, 9 and 11* [noncapital offenses] from the regularly scheduled date, which was tomorrow, March 12, 1998 at 10 a.m." (Emphasis added.)

{¶ 126} When counsel did not object, the panel asked Green whether there was anything he wished to say in regard to "*those* counts" (the *noncapital* counts it had just referred to—Counts 1, 2, 3, 9, and 11) "as well as on Counts 7, 8 and 10" (also *noncapital* counts). The panel then heard over fifteen transcript pages of victim-impact testimony and imposed sentence for all of the noncapital counts and specifications. Immediately after imposing sentence for the noncapital offenses, the panel launched into sentencing on the capital counts—Counts 4, 5, and 6—

without ever asking Green whether there was anything he wished to say in regard to those offenses.

2

{¶ 127} In Part V, citing our *Huertas, Goodwin,* and *Fautenberry* cases, the majority correctly determines that the trial court erred when it permitted Moore and his family members to express their opinions about how Green should be punished for the offenses against El-Okdi. Because Green did not object, I agree with the majority's decision to apply a plain-error analysis. I disagree, however, with the majority's instruction to the trial court on remand to "*clarify whether or not they considered* such expressions of opinion from others as to what the sentence should be in this case." (Emphasis added.) The imposition of such a requirement here could be misconstrued in future cases to be a statement by this court that plain error exists whenever a trial court fails to state expressly that it ignored improper testimony.

{¶ 128} As the majority notes, we may presume that trial judges do not rely on inadmissible expressions of opinion. This presumption relieves trial courts of the duty to discount expressly every sort of improperly admitted testimony in their sentencing opinions. By requiring the trial court to clarify whether it considered the improper testimony in this case, the majority undercuts the very presumption that it cites.

LUNDBERG STRATTON, J., concurs in the foregoing concurring opinion.

_____

**DOUGLAS, J., concurring in part and dissenting in part.**

{¶ 129} I respectfully dissent from the second paragraph of the body of the majority opinion and Parts II, IV, V, IX and, in part, Part X of the opinion. I do so because I believe that the pronouncements of the three-judge panel, while both

wrong and intemperate in places,[2] were substantially accurate overall and the judgments rendered by the panel should be affirmed.

{¶ 130} I respectfully concur in the remainder of the majority opinion. Accordingly, I would affirm in all respects the judgments of the three-judge trial panel.

_____

**ALICE ROBIE RESNICK, J., concurring in part and dissenting in part.**

{¶ 131} I would affirm *in toto* the judgment of the trial court, including Green's death sentence. I do not agree with the majority's conclusion that Green's right of allocution was violated.

{¶ 132} Although the majority opinion sets forth much of the exchange that took place between the trial court and Green's attorneys prior to sentencing, that exchange is detailed more fully below to support my view that Crim.R. 32 was not violated:

"The Court: All right. Is there anything with regard to those offenses, Counsel or *Mr. Green*, prior to the Court passing sentence on both those counts as well as on Counts 7, 8 and 10?

"Mr. Cameron [defense counsel]: Anything *we* wish to say?

"The Court: *Yes*.

---

2. As examples, the panel's opinion, in discussing *State v. McGuire* (1997), 80 Ohio St.3d 390, 686 N.E.2d 1112, says that "[i]n the syllabus to that opinion, the *7-2* majority of the Supreme Court states * * *." (Emphasis added.) There are, of course, a total of only seven justices on the Supreme Court of Ohio—not nine. Also, the two justices to which the opinion of the three-judge panel refers, did, in fact, concur with the judgment of the majority.

Further, in continuing to discuss *McGuire,* the opinion of the three-judge panel says that "[t]his bright-line rule—overruling earlier decisions—in the view of this panel is *wrongheaded* to the point where one day its blind application will almost surely result in the execution of an innocent defendant." (Emphasis added.) At least five members of this court respectfully disagree with the three-judge panel. That is just how our system works. Judges should be able to disagree, agreeably.

"Mr. Wingate [defense counsel]: *The only thing* that we would add, Your Honor, is that it's my understanding of the law that—that if the firearm specification which is attendant to those counts arose out of the same transaction and met that format, then there would be one firearm, which would mean there would be one 3-year sentence that would be attendant to those charges, and we just ask the Court—

"The Court: I believe I already indicated that, but that's our finding.

"Mr. Wingate: All right. Then *nothing further*." (Emphases added.)

{¶ 133} I have little quarrel with the legal standards set forth in the majority opinion regarding the importance of the right of allocution and the need to adhere to the requirements of Crim.R. 32. However, as the above discourse unmistakably illustrates, the record makes clear that this defendant was "issued a personal invitation to speak prior to sentencing," and that this defendant chose not to take advantage of the unambiguous opportunity to make a statement. See *Green v. United States* (1961), 365 U.S. 301, 305, 81 S.Ct. 653, 655, 5 L.Ed.2d 670, 674.

{¶ 134} The trial court explicitly addressed "Mr. Green," as well as trial counsel, before sentence was passed. As demonstrated by the trial court's response to Mr. Cameron's clarifying question, this was an invitation to "Mr. Green" to say anything he wished to say. After Mr. Wingate made a comment and Green did not say anything, then Mr. Wingate explicitly stated "nothing further." From the context of the entire dialogue, there should be no question that the declaration "nothing further" should be fairly interpreted as a clear indication by counsel that Green had no desire to make his own statement.

{¶ 135} Because I strongly disagree with the majority's statement that "[t]he record demonstrates a clear violation of Crim.R. 32," I respectfully dissent.

DOUGLAS, J., concurs in the foregoing opinion.

_____