[Cite as *In re M.S.*, 2012-Ohio-5397.]

| STATE OF OHIO | ) | IN THE COURT OF APPEALS |
| | )ss: | NINTH JUDICIAL DISTRICT |
| COUNTY OF SUMMIT | ) | |

IN RE: M.S.

C.A. No.     26522

APPEAL FROM JUDGMENT
ENTERED IN THE
COURT OF COMMON PLEAS
COUNTY OF SUMMIT, OHIO
CASE No.     DN11-02-0132

DECISION AND JOURNAL ENTRY

Dated: November 21, 2012

MOORE, Presiding Judge.

{¶1}    Appellant, Christopher S. ("Father"), appeals a judgment of the Summit County Court of Common Pleas, Juvenile Division, that terminated his parental rights to his minor child and placed the child in the permanent custody of Summit County Children Services Board ("CSB").  This Court affirms.

I.

{¶2}    Father is the natural father of M.S., born February 17, 2010, as well as an older child who is not at issue in this case.  Although Father maintains an ongoing live-in relationship with the mother of M.S. ("Mother"), she is not a party to this appeal.

{¶3}    M.S. was removed from the custody of both parents shortly after her birth because the parents were unable to meet her basic needs due to their serious, untreated mental health problems and Mother's mild mental retardation.  M.S. was later adjudicated a dependent child.

**{¶4}** The case plan required the parents to participate in regular mental health treatment, drug screening, and parenting education, with an ultimate goal that they demonstrate their ability to consistently meet the daily needs of M.S. Throughout the next year, however, Father and Mother made only sporadic efforts to comply with the reunification goals of the case plan.

**{¶5}** CSB eventually moved for permanent custody of M.S., alleging that she could not be returned to the custody of her parents within a reasonable time or should not return to their home, based on several factors under R.C. 2151.414(E), and that permanent custody was in her best interest. *See* R.C. 2151.414(B)(1)(a). The trial court held a hearing on CSB's motion for permanent custody, as well as the parents' alternative motions for legal custody, for a six-month extension of temporary custody, or for the maternal great-grandmother to receive legal custody of M.S.

**{¶6}** At the beginning of the hearing, father's counsel asked the trial court to continue the hearing because he had not had a prior opportunity to confer with his client. The trial court granted counsel a brief recess but refused to continue the hearing. The two-day hearing went forward, with full participation of Father and his counsel.

**{¶7}** The trial court later issued its decision in which it found that CSB had established by clear and convincing evidence that the parents had failed to substantially remedy the conditions that caused M.S. to be removed from their custody and that permanent custody was in her best interest. Consequently, it terminated parental rights and placed M.S. in the permanent custody of CSB. Father appeals and raises one assignment of error.

II.

**ASSIGNMENT OF ERROR**

THE TRIAL COURT'S DENIAL OF COUNSEL'S MOTION FOR A CONTINUANCE OF THE PERMANENT CUSTODY TRIAL DEPRIVED [FATHER] OF HIS RIGHT TO DUE PROCESS UNDER THE LAW AND IS [R]EVERSIBLE ERROR.

**{¶8}** Father's sole challenge to the permanent custody decision is that the trial court deprived him of his right to due process by denying his request to continue the hearing. Pursuant to Juv.R. 23, "[c]ontinuances shall be granted only when imperative to secure fair treatment for the parties." The decision to grant or deny a continuance lies within the sound discretion of the trial judge, which requires a balancing of "any potential prejudice to a [party against] concerns such as a court's right to control its own docket and the public's interest in the prompt and efficient dispatch of justice." *State v. Unger*, 67 Ohio St.2d 65, 67 (1981). "'There are no mechanical tests for deciding when a denial of a continuance is so arbitrary as to violate due process. The answer must be found in the circumstances * * *, particularly in the reasons presented [when] the request is denied.'" *State v. Green,* 90 Ohio St.3d 352, 368 (2000), quoting *Ungar v. Sarafite*, 376 U.S. 575, 589 (1964).

**{¶9}** Father's counsel requested a continuance of the hearing because he had not conferred with his client before that morning. He explained that Father did not have a working telephone, and counsel had been unsuccessful in attempting to set up a meeting via regular or electronic mail.

**{¶10}** CSB and the guardian opposed Father's request to continue the hearing. Consequently, the trial judge denied Father's initial request for a continuance, explaining that she "at least want[ed] to get started" with the hearing that day. The judge further stated to Father's counsel, however, that she would grant him considerable leeway to confer with Father as the

hearing proceeded: "If you need a recess from time to time to discuss witness testimony with your client, I'll be very generous with that[.]" The trial judge reiterated that she would allow breaks prior to defense counsel's cross-examination of witnesses and that she would consider a renewed request for a continuance "if the need arises" prior to the presentation of Father's case.

{¶11} The record reveals, however, that after a brief recess at the commencement of the hearing to discuss whether Father wanted to voluntarily relinquish his parental rights, Father's counsel never requested a recess or continuance of the hearing. Instead, Father and his counsel proceeded to actively oppose CSB's motion for permanent custody and appeared to be fully prepared to do so. Father's counsel cross-examined each of the witnesses presented by CSB as well as the guardian ad litem. He also presented the testimony of Father and a maternal relative who testified on behalf of both parents. Father has not pointed to any deficiencies in his defense at the hearing, nor has he explained how his defense would have been any different had a continuance been granted.

{¶12} The evidence before the trial court overwhelmingly supported its permanent custody decision. Before a juvenile court may terminate parental rights and award to a proper moving agency permanent custody of children, it must find clear and convincing evidence of both prongs of the permanent custody test that: (1) the children are abandoned, orphaned, have been in the temporary custody of the agency for at least 12 months of the prior 22 months, or that the children cannot be placed with either parent within a reasonable time or should not be placed with either parent, based on an analysis under R.C. 2151.414(E); and (2) the grant of permanent custody to the agency is in the best interests of the children, based on an analysis under R.C. 2151.414(D). *See* R.C. 2151.414(B)(1) and 2151.414(B)(2); *see also In re William S.*, 75 Ohio St.3d 95, 99 (1996).

{¶13} The trial court found that the first prong of the permanent custody test had been satisfied because M.S. could not be returned to her parents' home within a reasonable time or should not be returned to their home because they had failed to substantially remedy the conditions that caused the child's continued removal from her home. R.C. 2151.414(E)(1). Specifically, the trial court found that "[d]ue to the severity of Mother's cognitive delays and Father's mental illness, these parents, unfortunately, are not capable of providing M.S. with a permanent home."

{¶14} Evidence about Mother's cognitive impairment came primarily from the psychologist who performed her parenting evaluation, who testified that Mother was mildly mentally retarded and functioned at about a fourth grade level. Even after parenting classes, Mother could not explain how to prepare food or formula for M.S., did not know when or how often to feed her, and her concept of when M.S. should reach certain developmental milestones was "grossly off." The psychologist also testified that Mother's parenting ability was further hampered by her lack of motivation to try to learn the parenting skills required to provide for her child's basic needs.

{¶15} In addition to cognitive delays, Mother had been diagnosed with major depressive disorder, for which she had been hospitalized twice due to her suicidal thoughts and self-harming behavior. Mother had also been diagnosed with borderline personality disorder. Mother denied or minimized her mental health symptoms, however, and was reluctant to participate in treatment. Although she was briefly involved in counseling during this case, she was terminated from the program due to her lack of attendance. It was unclear whether Mother ever received medication to treat her mental health symptoms.

{¶16} The undisputed evidence was that, due to her cognitive delays and untreated mental illness, Mother would have difficulty meeting even her own daily needs. To meet the additional needs of her child, Mother would need "consistent and permanent supervision for all day-to-day tasks[.]" There was also evidence that Mother relied on the assistance of Father and was emotionally dependent on him. The position of the parents at the hearing was that Father, who has a normal intelligence level, provided assistance to Mother and would continue to do so. Although Father's cognitive ability was not impaired, he had his own untreated mental health problems that seriously affected his ability to care for M.S.

{¶17} There was evidence that Father's untreated mental illness had resulted in a long history of behavioral problems, which included felony convictions for assaulting a police officer, menacing by stalking, and burglary. Father also had several misdemeanor convictions and had been ordered to have no contact with the mother of his older child. Consequently, he had not seen his older child for six years.

{¶18} During one of his criminal cases, Father's competency to stand trial was disputed and he was ordered to undergo a mental health evaluation. At that time, he was diagnosed with bipolar disorder, anxiety, and major depression. An expert witness testified that all of Father's mental illnesses were chronic and required ongoing treatment. The expert further explained that, although Father did not have all of the classic symptoms of bipolar disorder, he was easily irritated and prone to racing thoughts and paranoid thinking. Moreover, Father did not dispute that medication prescribed to treat bipolar disorder helped to regulate his behavior and moods, but that he did not regularly take the medication. Without consistent counseling and medication management, the expert further explained, Father would be unable to meet even his own basic needs.

{¶19} More recently, Father was also diagnosed with poly-substance abuse and antisocial personality disorder. The expert who performed the more recent evaluation explained that Father tended to blame others for his family's situation and was resistant to obtaining the mental health treatment that he needed.

{¶20} During this case, Father failed to engage in mental health treatment on a consistent basis. He switched from one mental health agency to another, did not attend counseling sessions at either one on a consistent basis, and did not regularly take his prescribed psychiatric medications. For a period of approximately eight months during this case, Father had no contact with mental health providers at either agency.

{¶21} Due to his failure to obtain consistent treatment for his mental illnesses, Father's inability to control his anger and paranoid thoughts remained a problem throughout this case. He refused to cooperate with CSB, the trial court, the guardian ad litem, the child's relative caretakers, or service providers because he did not trust them. Father harassed the caseworker over the telephone by leaving repeated threatening voicemail and e-mail messages that the caseworker described as bizarre, hostile, and filled with profanity. Father also made repeated harassing phone calls to the guardian ad litem, counsel for CSB, and the great-aunt and great-uncle with whom M.S. resided. Father also repeatedly called the magistrate who presided over the prior adjudicatory and dispositional hearings. On May 12, 2011, although the magistrate had ordered Father to stop attempting to communicate with him over the telephone, Father left him seven angry voicemail messages, which the magistrate described as "profanity laced," and "confused and ranting."

{¶22} The guardian ad litem testified that Father had also exhibited similar behavior toward her in their face-to-face interactions. Six weeks before the hearing, while the guardian

was observing the parents visiting with M.S., Father was agitated and hostile toward her and the visitation aide. After referring to the two as a "bunch of snakes" and suggesting to Mother that they were going to "make up a whole lot of lies" about them, Father stated that he could not "take this anymore" and abruptly left the visit.

{¶23} Although Father testified at the hearing that he was back in counseling and was taking his psychiatric medication, he continued to exhibit symptoms of his mental illness. Father's testimony, which was somewhat rambling and disjointed at points, reflected his anger, paranoia, and distrust of others. The trial judge further observed that Father "testified in angry and threatening tones."

{¶24} Father admitted that he had made the threatening phone calls, but attempted to justify his behavior and suggested that anyone in the courtroom would have done the same thing to protect their child. Father stated that he had made so many phone calls because he believed that his rights were being violated and that his daughter was not being properly cared for. He gave specific examples of minor symptoms that M.S. had exhibited, such as discharge from her eyes and heavy breathing when she cried, which he insisted were life-threatening symptoms that were not being adequately treated. Although medical professionals had determined that these symptoms did not require treatment, Father refused to believe them and continued to insist that the life of M.S. was in danger.

{¶25} Given the overwhelming and undisputed evidence before the trial court, it reasonably concluded that Mother and Father had failed to remedy the circumstances that had caused the continued removal of M.S. from their custody and that, consequently, M.S. could not be returned to their home within a reasonable time or should not be returned there. *See* R.C.

2151.414(E)(1). Therefore, the trial court's conclusion that CSB had established the first prong of the permanent custody test was fully supported by the record.

{¶26} The trial court also found that permanent custody was in the best interest of M.S. When determining whether a grant of permanent custody is in a child's best interests, the juvenile court must consider the following factors:

> (a) The interaction and interrelationship of the child with the child's parents, siblings, relatives, foster caregivers and out-of-home providers, and any other person who may significantly affect the child;

> (b) The wishes of the child, as expressed directly by the child or through the child's guardian ad litem, with due regard for the maturity of the child;

> (c) The custodial history of the child, including whether the child has been in the temporary custody of one or more public children services agencies or private child placing agencies for twelve or more months of a consecutive twenty-two-month period * * * ;

> (d) The child's need for a legally secure permanent placement and whether that type of placement can be achieved without a grant of permanent custody to the agency[.]

R.C. 2151.414(D)(1)(a)-(d).[1]

{¶27} Due to their failure to comply with the case plan, the parents' interaction with M.S. never progressed beyond weekly, closely-supervised visitation. Moreover, their attendance at visits was so sporadic that they were repeatedly removed from the visitation schedule for failing to attend. The parents offered no explanation for most of their absences from the scheduled visits. During the three months before the permanent custody hearing, the parents attended only one visit with M.S., and Father left that visit early. Due to their lack of regular interaction with M.S., there was no parent-child bond between M.S. and either of her parents.

---

[1] The factor set forth in R.C. 2151.414(D)(1)(e) does not apply to the facts of this case.

{¶28} On the other hand, M.S. had developed a close bond with the maternal relatives with whom she originally resided and the maternal great-aunt and great-uncle with whom she resided at the time of the hearing. The great-aunt and great-uncle had regularly visited with M.S. since she came into agency custody. Because they expressed a desire to provide a permanent home for M.S, she was later placed in their home. The evidence was undisputed that they were providing M.S. with a loving and appropriate home and that they planned to continue doing so.

{¶29} Because M.S. was only fifteen months old at the time of the hearing, the guardian ad litem spoke on her behalf. She recommended that CSB be granted permanent custody so the maternal great-aunt and great-uncle could adopt her.

{¶30} Aside from the first few days after her birth that M.S. was in the custody of her parents, she had spent her short life in temporary relative placements. Her parents were unable to provide a permanent home for her, and CSB had not found a suitable relative to take legal custody. Although the maternal great-grandmother expressed her interest in legal custody at the time of the hearing, she had visited M.S. only a few times during this case and did not have a relationship established with her. The great-grandmother also testified that she was prepared to facilitate visitations between M.S. and her parents, but she seemed to be unaware of the mental health problems of either parent. Moreover, the great-grandmother was seventy years old and had multiple health problems, including cancer that was in remission. The trial court reasonably concluded that, because M.S. needed a stable home for the next seventeen years and was already bonded with the great-aunt and great-uncle, it would not be in her best interest to be placed in the legal custody of her great-grandmother.

{¶31} The maternal great-aunt and great-uncle, with whom M.S. currently resided, were interested in providing M.S. with a permanent home. They were not willing to have legal

custody of her, however. Because legal custody would preserve the parents' residual right to visit M.S., they believed that harassment by Father would only continue if the parents' rights were not terminated. Consequently, because the great-aunt and great-uncle were interested in adoption of M.S., but not legal custody, the trial court reasonably concluded that a legally secure permanent placement could only be achieved by granting CSB permanent custody.

{¶32} Given that the trial court heard overwhelming evidence to support its decision and Father has failed to demonstrate that he suffered any prejudice due to the trial court's refusal to continue the permanent custody hearing, Father's assignment of error is overruled.

III.

{¶33} Father's assignment of error is overruled. The judgment of the Summit County Court of Common Pleas, Juvenile Division, is affirmed.

Judgment affirmed.

———

There were reasonable grounds for this appeal.

We order that a special mandate issue out of this Court, directing the Court of Common Pleas, County of Summit, State of Ohio, to carry this judgment into execution. A certified copy of this journal entry shall constitute the mandate, pursuant to App.R. 27.

Immediately upon the filing hereof, this document shall constitute the journal entry of judgment, and it shall be file stamped by the Clerk of the Court of Appeals at which time the period for review shall begin to run. App.R. 22(C). The Clerk of the Court of Appeals is instructed to mail a notice of entry of this judgment to the parties and to make a notation of the mailing in the docket, pursuant to App.R. 30.

Costs taxed to Appellant.

CARLA MOORE
FOR THE COURT

BELFANCE, J.
CONCURS.

CARR, J.
CONCURRING.

{¶34} Proceedings regarding the termination of parental rights are recognized as the family law equivalent of a death penalty case. *In re D.A.*, 113 Ohio St.3d 88, 2007-Ohio-1105, ¶ 10. Due to grave concerns regarding these cases, I write separately to emphasize that ordinarily a continuance of a permanent custody hearing would be warranted and required in a case where counsel has only met with a parent-client immediately prior to the hearing. However, under the facts and circumstances of this case, including in particular the trial court's willingness both to call recesses in the proceedings to allow Father and counsel to confer prior to cross-examination of CSB's witnesses and to consider any renewed request for a continuance prior to the presentation of Father's case-in-chief, I agree that the trial court did not err by denying Father's request for a continuance.

APPEARANCES:

LEONARD J. BRIEDING, II. Attorney at Law, for Appellant.

SHERRI BEVAN WALSH, Prosecuting Attorney, and RICHARD S. KASAY, Assistant Prosecuting Attorney, for Appellee.

JOSEPH M. KERNAN, Guardian ad Litem.