[Cite as *State v. Henry*, 2024-Ohio-849.]

# IN THE COURT OF APPEALS
# FIRST APPELLATE DISTRICT OF OHIO
# HAMILTON COUNTY, OHIO

| | | |
|---|---|---|
| STATE OF OHIO, | : | APPEAL NO. C-230287 |
| | | TRIAL NO. B-2200597 |
| Plaintiff-Appellee, | : | |
| | | |
| vs. | : | |
| | | *O P I N I O N.* |
| SELINDA HENRY, | : | |
| | | |
| Defendant-Appellant. | : | |

Criminal Appeal From: Hamilton County Court of Common Pleas

Judgment Appealed From Is: Affirmed

Date of Judgment Entry on Appeal: March 8, 2024

*Melissa A. Powers*, Hamilton County Prosecuting Attorney, and *John D. Hill, Jr.*, Assistant Prosecuting Attorney, for Plaintiff-Appellee,

*Michael J. Trapp*, for Defendant-Appellant.

**Bock, Presiding Judge.**

{¶1}   A gunfight in defendant-appellant Selinda Henry's home resulted in Cornelius Thomas's serious injuries and Eugene Cunningham's death. Henry accepted police officers' invitation to answer questions at the police station, allowed police detectives to access and search her phone, and voluntarily made statements both before and after the detectives notified her of her rights under *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).

{¶2}   The state charged Henry with aggravated murder, murder, aggravated robbery, and felonious assault, all with gun specifications, and one count of tampering with evidence. After the trial court denied her motion to suppress evidence, a jury acquitted her of all counts, except the tampering-with-evidence count.

{¶3}   Henry appeals the trial court's denial of her motion to suppress the statements she made to the police detectives, arguing that the statements she provided before the detectives had informed her of her rights under *Miranda* were made during a custodial interrogation. Henry argues that the statements she made after the detectives notified her of her *Miranda* rights should have been suppressed because they provided the *Miranda* warnings hours into a lengthy interrogation and Henry lacked a meaningful choice to exercise her *Miranda* rights. Finally, Henry asserts that her conviction was based on insufficient evidence.

{¶4}   Because the *Miranda* warnings informed Henry of her rights against self-incrimination, Henry voluntarily offered incriminating statements after police informed her of her rights, and her conviction was supported by sufficient evidence, we overrule Henry's assignments of error and affirm the trial court's judgment.

## I.     Facts and Procedure

### A.     Police investigated a shooting

{¶5} During autumn and early winter 2021, Henry communicated with Thomas, a former paramour. In December 2021, Thomas visited Henry's townhouse. Thomas testified that when he attempted to leave Henry's home, a man wearing a ski mask, sunglasses, and a hood—later identified as Cunningham—hit him on the head with a gun, pushed him backwards into Henry's living room, pointed a gun in Thomas's face, ordered Thomas to give him everything he had, and shot Thomas in the foot.

{¶6} Thomas pulled a gun from his waistband and fired back at Cunningham. The two men engaged in a gunfight. Cunningham shot Thomas several additional times in the leg and stomach. After Cunningham ran from the townhouse, Thomas left the townhouse and went to the hospital.

{¶7} Henry went to a neighbor's house, who called 911. When Cincinnati police officers arrived at the scene, they found Cunningham lying between two vehicles with a handgun next to him and a trail of blood leading back to Henry's townhouse. Cunningham died on the way to the hospital.

{¶8} Henry agreed to give a statement to the police. Police transported Henry, who was not handcuffed, to the Criminal Investigation Section ("CIS") in a police cruiser.

### B.     The interview

{¶9} When Henry agreed to provide a statement to police, they thought that Henry was a victim of the crime and believed that Cunningham had shot at both her

and Thomas. Officers placed Henry in a "soft" interview room, which had a window and remained unlocked.

### 1. Pre-*Miranda* statements

{¶10} Homicide detectives Eric Karaguleff and Jeff Smallwood interviewed Henry, but they did not arrive to interview Henry until about three hours after an officer brought her to CIS. The officer who transported Henry offered her refreshments, ensured she was comfortable, apologized for the wait, and casually chatted with Henry about topics such as the weather, the Bengals, the neighborhood, and more.

{¶11} Before the detectives arrived, Henry opened the door to the interview room and walked around several times. Although employees use a badge to enter the building, anyone could open the doors to exit from the building. Smallwood testified that soft interview rooms were typically used to interview witnesses and victims, rather than suspects, and Henry was free to leave.

{¶12} Though it is not clear when, at some point before Henry arrived at CIS, Henry had given her phone to police officers. As Detectives Smallwood and Karaguleff collected Henry's demographic information, she asked if she could get her phone back. The officers responded, "We'll talk about that in just a minute," and continued asking Henry questions about her employment and her children before asking her to tell them about what she had witnessed.

{¶13} Henry stated that other than Thomas, no one had been at her home from the previous evening until the shooting. She stated that Thomas was leaving her house and when he opened the door, a "dude" came in and shot at her and Thomas. Later, she told the detectives that she immediately recognized Cunningham when he entered

4

her house. She said she ran upstairs and when she came downstairs, she saw that Thomas had been shot and was leaving and was getting into a car. She said that Thomas accused her of setting him up. And she told police that she had a prior relationship with Cunningham, which had ended the previous July, and she had not been in contact with him for a few months.

{¶14} About 25 minutes into the interview, Smallwood asked Henry if they could access her phone. When Henry asked if she could have her phone back and how long she had to stay there, Smallwood responded that they would get it to her as soon as possible, she was free to go home, and they would bring her phone to her when they were finished with it. Later, Karaguleff asked who they should contact to return her phone to her if she was not home when they returned it. Henry provided her phone's passcode to the detectives. Henry denied erasing anything from her phone or communicating with Cunningham about Thomas being at her house.

{¶15} Henry again asked how long she would have to be there and if she could have her keys. Smallwood told her not long and they were bringing down her keys. Just after that, the detectives left the room and then Henry left the room briefly.

{¶16} After about five minutes, the detectives returned to the room. They gave her a "consent to search" form for her phone and told her that someone was on the way to process it. Karaguleff told her that she need not wait for her phone and she could leave if she wanted. When Henry asked if she had to sign the consent form, the detectives told her that she did not have to sign it.

{¶17} It appears that during the five minutes that the detectives had left the room, they learned that investigators had found a cell phone inside Henry's purse at

5

her townhouse. When the detectives asked about the phone in the purse, Henry denied knowing anything about it.

{¶18} The detectives offered to let her leave to have a cigarette and then check to see if they had finished with her phone, but Henry did not take them up on their offer. Later, Henry asked Smallwood for a lighter. He asked her if she wanted to go downstairs to smoke.

{¶19} Karaguleff left the room. When he reentered the room, he showed Henry a picture of the phone that investigators had found in the purse at Henry's house—Henry said she did not recognize it.

{¶20} After Karaguleff left the room and reentered it, the detectives' questions became more confrontational. They asked Henry about several recent phone calls to and from Henry's phone and Cunningham's phone, including an hour-and-33-minute phone call from Henry to Cunningham that spanned from shortly after Thomas arrived to just before the shootout happened. Henry denied remembering calling Cunningham and said that she did not mean to call him.

{¶21} The detectives questioned Henry for approximately 22 minutes after they learned about these phone calls. Henry repeatedly denied purposely calling Cunningham or setting up Thomas. The detectives told Henry that they were taking a break. She asked for some matches—they replied that they would try to find some and told her they wanted her to stay in the room.

{¶22} But when Henry asked to leave the room to use the restroom, she was permitted to leave the room. When the detectives returned to the room, Smallwood read Henry her *Miranda* rights and Henry indicated that she understood her rights.

### 2. Post-*Miranda* Statements

**{¶23}** The detectives told Henry that they called Cunningham's cell phone and the phone that investigators had found inside of Henry's purse rang. Henry said she had not touched the phone. The detectives began questioning Henry about how the phone ended up in her purse. Henry denied touching Cunningham's phone and said she did not know how the phone got into her purse.

**{¶24}** Eventually, however, Henry admitted to picking Cunningham's phone up off of her couch and putting it in her purse after denying ever touching it. She said she did not know that the phone belonged to Cunningham. Later, she said that she should not have touched the phone and should have left the phone on the couch.

**{¶25}** Under the theory that Henry had lured Thomas to her home so that Cunningham could rob him, the state charged Henry with aggravated murder, murder, aggravated robbery, felonious assault, and one count of tampering with evidence.

### 3. Trial court denied Henry's motion to suppress

**{¶26}** Henry moved to suppress the statements that she had made to the police detectives at CIS. After a hearing, the trial court denied Henry's motion, finding that Henry was questioned pre-*Miranda* warnings for about two-and-a half hours and was free to move around. It noted that Henry had opened the door to the interview room and walked out multiple times and officers offered to allow her to leave the building to smoke several times. The trial court noted that police are not required to administer *Miranda* warnings to everyone they question, *Miranda* warnings are not required merely because a person is questioned at a police station, and the requirement to provide warnings under *Miranda* is triggered only by custodial interrogations.

**{¶27}** Noting that Henry "voluntarily" left the room again just before Smallwood informed her of her *Miranda* rights, the court concluded that "a reasonable person would believe that this was not a custodial setting," and therefore, denied the motion to suppress both the pre- and post-*Miranda* statements.

**{¶28}** At trial, the jury viewed the video of Detectives Smallwood and Karaguleff interviewing Henry in which Henry admitted that she had moved Cunningham's phone from the couch to her purse, after initially lying about it. They also heard evidence that Henry had deleted messages and evidence of communications between her and Cunningham from her phone. In its closing argument, the state argued that the tampering-with-evidence count was based on Henry hiding Cunningham's phone from them.

**{¶29}** The jury returned a guilty verdict only on the tampering-with-evidence charge. The trial court imposed on Henry a three-year sentence. This appeal followed.

## II.    Law and Analysis

### A.    The trial court did not err by failing to suppress Henry's statements

**{¶30}** Henry's first assignment of error asserts that the trial court erred by failing to suppress her statements made to police.

**{¶31}** Appellate review of a motion to suppress presents a mixed question of law and fact. *State v. Burnside*, 100 Ohio St.3d 152, 2003-Ohio-5372, 787 N.E.2d 71, ¶ 8. We accept the trial court's factual findings if they are supported by competent and credible evidence, but we review the court's legal conclusions de novo. *Id.*

**{¶32}** The Fifth Amendment to the United States Constitution and Article I, Section 10 of the Ohio Constitution protect criminal suspects and defendants against self-incrimination. *City of Cleveland v. Oles*, 152 Ohio St.3d 1, 2017-Ohio-5834, 92

N.E.3d 810, ¶ 8.

{**¶33**} In *Miranda v. Arizona*, the United States Supreme Court held that the state is prohibited from using statements that a suspect makes to police "stemming from custodial interrogation of the defendant unless it demonstrates the use of procedural safeguards effective to secure the privilege against self-incrimination." *Miranda*, 384 U.S. at 444, 86 S.Ct. 1602, 16 L.Ed.2d 694. The Court defined custodial interrogation as "questioning initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of his freedom of action in any significant way." *Id.* Before questioning a suspect in a custodial interrogation, the state must warn the suspect "that he has the right to remain silent, that anything he says can be used against him in a court of law, that he has the right to the presence of an attorney, and that if he cannot afford an attorney one will be appointed for him prior to any questioning if he so desires." *Id.* at 479.

### 1. **Pre-*Miranda* statements**

{**¶34**} Henry first argues that the trial court should have suppressed her pre-*Miranda* statements because a reasonable person would have believed that she was in custody during the entire interview.

{**¶35**} The court's factual finding that Henry was not in a custodial interrogation before the detectives notified her of her rights under *Miranda* was supported by competent, credible evidence. The detectives did not deny Henry's requests to leave the room before they provided the *Miranda* warnings. Henry voluntarily provided the police access to her phone. Detectives told her that she was free to leave the building and they would bring her phone to her after they finished

downloading the information. The trial court did not err by failing to suppress Henry's pre-*Miranda* statements.

## 2. **Henry voluntarily waived her *Miranda* rights**

{¶36} A "defendant may waive effectuation of [*Miranda*] rights, provided the waiver is made voluntarily, knowingly and intelligently." *State v. Biros*, 78 Ohio St.3d 426, 439-440, 678 N.E.2d 891 (1997).

{¶37} Henry's waiver of her *Miranda* rights against self-incrimination was valid if the totality of the circumstances show both 1.) her choice to provide statements was an uncoerced choice, and 2.) she understood the rights that she was waiving. *State v. Tibbetts*, 92 Ohio St.3d 146, 154, 749 N.E.2d 226 (2001). To determine whether a waiver was valid, courts should consider " 'the age, mentality, and prior criminal experience of the accused; the length, intensity, and frequency of interrogation; the existence of physical deprivation or mistreatment; and the existence of any threat or inducement.' " *State v. Green*, 90 Ohio St.3d 352, 366, 738 N.E.2d 1208 (2000), quoting *State v. Edwards*, 49 Ohio St.2d 31, 358 N.E.2d 1051 (1976), paragraph two of the syllabus.

{¶38} Henry argues that her waiver of her rights under *Miranda* was invalid because the detectives had questioned her before providing the *Miranda* warnings and did not inform her that her unwarned statements could not be used against her. She asserts that the detectives asked the same questions before and after providing the warnings. But the interview video does not bear this out. The only relevant charge is tampering with evidence. While Henry told the detectives before the detectives provided *Miranda* warnings that she did not erase anything from her phone, the tampering charge was based on Henry attempting to hide Cunningham's phone from

them. She provided no statements to the detectives about doing so until after the detectives had read Henry the *Miranda* warnings.

{¶39} Citing *State v. Farris*, 100 Ohio St.3d 519, 2006-Ohio-3255, 849 N.E.2d 985, Henry argues that because she had been up all night, had been drinking, and had been subjected to a long wait and lengthy interrogation, her waiver was invalid. In *Farris*, the defendant had been in custody after a traffic stop and he was not free to leave. *Id.* at ¶ 14. He made "virtually identical" statements to police before and after an officer provided the *Miranda* warnings. *Id.* at ¶ 15.

{¶40} But unlike the defendant in *Farris*, Henry was not subject to a custodial interrogation before the detectives provided *Miranda* warnings. As discussed above, the trial court's finding that the pre-*Miranda* discussions did not amount to a custodial interrogation was supported by competent, credible evidence. And nothing in the interview video suggested that Henry's waiver of her *Miranda* rights was unknowing or involuntary.

{¶41} Because Henry was not in custody before detectives provided *Miranda* warnings and Henry's post-*Miranda* waiver of her right against self-incrimination was valid, we overrule her first assignment of error.

## B. The state's evidence supported Henry's conviction

{¶42} In her second assignment of error, Henry argues there was insufficient evidence supporting her tampering-with-evidence conviction.

{¶43} A sufficiency-of-the-evidence argument is a legal argument testing whether the state presented sufficient evidence to support the verdict. *State v. Rainey*, 1st Dist. Hamilton No. C-230055, 2023-Ohio-4666, ¶ 53. We must view the evidence in a light most favorable to the state to determine if any rational fact finder could have

found that the state proved each element of the offense beyond a reasonable doubt. *Id.*

{¶44} The jury found Henry guilty of tampering with evidence under R.C. 2921.12(A)(1), which provides, in part:

No person, knowing that an official proceeding or investigation is in progress, or is about to be or likely to be instituted, shall * * * [a]lter, destroy, conceal, or remove any record, document, or thing, with purpose to impair its value or availability as evidence in such proceeding or investigation.

{¶45} The state based the tampering-with-evidence charge on Henry's attempt to conceal the phone in her purse. While the detectives were interviewing Henry at CIS, police investigators found Cunningham's phone in Henry's purse at the crime scene. Henry lied to the detectives, telling them that she knew nothing about the phone. The state showed that Henry had deleted evidence of communications between her and Cunningham from her phone, which showed that she had motive to hide Cunningham's phone. And Henry eventually admitted to finding Cunningham's phone on the couch and moving it to her purse. She provided no explanation, other than admitting that she should not have moved the phone.

{¶46} The state provided sufficient evidence on every element of R.C. 2921.12(A)(1). First, because there had been a shootout in her townhouse involving the phone's owner, Henry knew that an official investigation was likely to begin. Second, Henry concealed Cunningham's phone—she moved it from plain sight on her couch to inside of her purse.

{¶47} Finally, the state provided evidence that Henry's purpose in moving the phone was to impair its value or availability as evidence in the investigation. Henry

12

knew that Cunningham's phone would show that she and Cunningham were in communication before and during the time that Thomas was at her house and the content of some of those communications. That Henry erased evidence of communications between her and Cunningham from her own phone would allow a reasonable person to conclude that Henry's attempt to hide Cunningham's phone was for the purpose of impairing its availability as evidence.

{¶48} The state provided sufficient evidence to support Henry's tampering-with-evidence conviction. A reasonable person could conclude that Henry concealed the phone for the purpose of impairing its availability as evidence in the investigation and proceeding involving the shootout. Because sufficient evidence supported Henry's conviction, we overrule Henry's second assignment of error.

### III.   Conclusion

{¶49}  For the foregoing reasons, we overrule Henry's assignments of error and affirm the trial court's judgment.

Judgment affirmed.

**ZAYAS, J**., and **KINSLEY, J.**, concur.

Please note:

The court has recorded its entry on the date of the release of this opinion.