[Cite as *State v. Martinez*, 2026-Ohio-1810.]

| STATE OF OHIO | ) | IN THE COURT OF APPEALS |
|---|---|---|
| | )ss: | NINTH JUDICIAL DISTRICT |
| COUNTY OF MEDINA | ) | |

| STATE OF OHIO | C.A. No. 2025CA0048-M |
|---|---|
| Appellee | |
| v. | APPEAL FROM JUDGMENT ENTERED IN THE |
| BERNARDO MARTINEZ | COURT OF COMMON PLEAS COUNTY OF MEDINA, OHIO |
| Appellant | CASE No. 2024CR0371 |

DECISION AND JOURNAL ENTRY

Dated: May 18, 2026

STEVENSON, Judge.

{¶1} Defendant-Appellant Bernardo Martinez appeals from the judgment of the Medina County Court of Common Pleas that found him guilty of corrupting another with drugs. For the reasons set forth below, this Court affirms.

I.

{¶2} In June 2024 Mr. Martinez was indicted by a grand jury on one count of corrupting another with drugs in violation of R.C. 2925.02(A)(3)(C)(1), a felony of the second degree. The victim is D.W., a 30-year-old female. Mr. Martinez pleaded not guilty and the matter proceeded to a jury trial. The State presented the testimony of D.W.'s father J.W., the Medina County Coroner Lisa Deranek, Detective John Girard of the Medina County Sheriff's Office, eyewitness Tyler Rowe, and Mr. Martinez's parole officer Stephanie Rodriguez. Mr. Martinez testified in his own defense and presented the testimony of eyewitnesses Scott Zimmerman and Jeff Hines. The State's

exhibits were all admitted into evidence and included photographs, toxicology and lab reports, the 911 call, and recordings of police interviews with Mr. Martinez.

{¶3} The record reflects that the events in question took place on February 1 and February 2, 2024, at the residence of Scott Zimmerman ("Zimmerman") at 2701 Granger Rd., Medina, Ohio. Jeff Hines ("Hines") and Mr. Martinez were also residing there. Zimmerman and Hines were in a romantic relationship. Mr. Martinez lived in the detached basement of Zimmerman's home where he also conducted his tattoo business. Mr. Martinez was on parole after serving a sentence for possession of methamphetamine ("meth").

{¶4} On the evening of February 1, 2024, D.W. left her father's residence in Cuyahoga Falls at approximately 8:15 p.m. and went to Mr. Martinez's residence. She and Mr. Martinez had known each other for approximately 10 years and had recently talked on the phone about D.W. getting a tattoo. According to both D.W.'s father and Mr. Martinez, D.W. had been sober from drug use for at least three years after going through numerous recovery programs and completing a prison term. She had regained custody of one of her children and was trying hard to stay sober. D.W. asked Mr. Martinez to make sure there would be no drugs at his residence.

{¶5} When D.W. arrived at Mr. Martinez's residence, Zimmerman and Hines were both present. Zimmerman was resting upstairs in his bedroom as he had chronic medical issues and was disabled. He was not aware of D.W.'s arrival. Hines raised the garage door to let D.W. in after receiving a text message from Mr. Martinez that she had arrived but did not have in-person contact with her.

{¶6} Tyler Rowe ("Rowe") testified that he arrived at the Zimmerman residence at approximately 10:00 p.m. carrying a bottle of Jack Daniels whiskey and a bottle of Coke. At the time, he was residing in a halfway house after serving a sentence for a parole violation. Rowe had

been going to Zimmerman's residence for the past seven or eight months to get high on meth. Rowe also knew Zimmerman because he had a deal with him to cut down trees on Zimmerman's property for firewood in exchange for money. When Rowe arrived, he was drunk and distraught over the death of his sister and was seeking meth. He was also looking for a place to wash his suit for his sister's funeral which was the next day. After Hines let Rowe in, Rowe asked Hines for meth, but Hines did not have any.

{¶7} Rowe then went downstairs seeking meth from Mr. Martinez. Mr. Martinez introduced Rowe to D.W. as they had never met before. D.W. told Rowe not to use meth because she had been sober for several years. Rowe, Mr. Martinez, and D.W. all took a shot of Jack Daniels. After approximately 30 minutes, Rowe and Mr. Martinez went upstairs into the kitchen and Mr. Martinez gave Rowe a line of meth. Mr. Martinez put his remaining supply of meth back in a "fold," a "[p]iece of paper, plastic, that people put their drugs in to conceal it so it doesn't get everywhere, easy access to open it . . . ." Mr. Martinez put the fold in his pocket and went back downstairs. At that point, Rowe began talking with Hines and eventually passed out on the couch in the living room.

{¶8} Rowe woke up after a few hours and decided to use the washer and dryer to wash his suit but could not get down to the basement because the door was locked. When he returned to the main part of the house from his attempt to enter the basement, he heard Mr. Martinez screaming from the basement for someone to call 911. Zimmerman called 911 after being awakened by Hines but gave the phone to Rowe because he was not physically able to get down to the basement and did not know what was happening. Although Rowe could not recall during his testimony how he got back down to the basement, the 911 call reflects that Rowe kicked the door open. When he got downstairs, Rowe saw D.W. naked and Mr. Martinez attempting to administer CPR on her.

{¶9} The EMTs responded at approximately 5:00 a.m. and transported D.W. from the residence. D.W. was later pronounced dead. The Medina County Coroner testified that based on the autopsy and toxicology reports, D.W. died from intoxication due to a lethal dose of meth and alcohol but noted that the alcohol alone could not have caused her death.

{¶10} The police arrived at the Zimmerman residence after D.W. was transported. Rowe spoke to the police, but Hines fled from the residence and hid in the woods due to his outstanding warrants. The police did not find any drugs during their search of the residence. Detective Girard of the Medina County Sheriff's Office responded to the residence shortly thereafter and spoke with Rowe. Detective Girard also interviewed Rowe again several months later.

{¶11} Rowe denied giving drugs to D.W., stating that the reason he came to the Zimmerman residence in the first place was because he did not have any meth and was seeking it. Rowe went to the basement looking for meth from Mr. Martinez because Hines did not give him any. When Rowe eventually obtained meth from Mr. Martinez, he was already upstairs, away from D.W.'s presence, and did not go back downstairs until the 911 call. According to Detective Girard, Rowe's statements at the scene and in the second interview were consistent with Rowe's testimony at trial.

{¶12} Detective Girard testified that during his search of the residence he found Mr. Martinez on the basement couch and took his statement. That interview was played for the jury. In the interview, Mr. Martinez told Detective Girard that Rowe had alcohol with him when he arrived in the basement and D.W. was not high on any drugs at that time. Mr. Martinez and D.W. walked Rowe to the top of the stairs because Rowe was drunk, then he and D.W. went back downstairs and had sex. Mr. Martinez then took his prescription medication and went to sleep. He woke up around 4:30 a.m. to D.W. making noises like she was struggling to breathe. He tried to

revive her with CPR and NARCAN. He said Zimmerman kept NARCAN all over the house, but Detective Girard did not find any NARCAN during his search of the residence. Mr. Martinez said that he tried to call 911 but his phone was dead, so he screamed for help. He told Detective Girard that D.W. was never away from him long enough to get high.

{¶13} When Detective Girard returned to his office, he received a call from a woman who said she had been at Zimmerman's house between 8:00 and 9:00 p.m. the night before and had spoken with D.W. Shortly thereafter, Detective Girard returned to the Zimmerman residence and spoke to Mr. Martinez about the woman, inquiring why Mr. Martinez did not tell him about her when they spoke earlier at the scene. That conversation was played for the jury. Mr. Martinez claimed the woman was a friend who brought him paper towels for his tattoo business and just briefly came to the door to hand him the paper towels then left, so he did not think her presence was significant. Detective Girard asked Mr. Martinez if the woman had brought him meth but Mr. Martinez denied it. Mr. Martinez did not mention that the woman had spoken with D.W. When pressed on that point by Detective Girard, Mr. Martinez admitted that D.W. and the woman talked for about 20-30 minutes. Mr. Martinez also admitted to Detective Girard that he started smoking meth again two days prior.

{¶14} During his further investigation, Detective Girard discovered a short video of D.W.'s genitalia on Mr. Martinez's phone that was time-stamped 3:47 a.m. on February 2, 2024. Believing this to be another important fact that Mr. Martinez did not disclose and that called into question Mr. Martinez's timeline of events, Detective Girard conducted a third interview of Mr. Martinez on February 5, 2024, which was also played for the jury. During the interview, Mr. Martinez identified the video as depicting D.W. but insisted that he woke up just minutes before D.W. went into distress, likely around 4:25 a.m., and did not know how the video was created on

his phone at 3:47 a.m. The video of D.W. was played for the jury. Mr. Martinez stated that he could not make sense of it and speculated that either Rowe, Hines, or D.W. herself must have made the video. When asked how Rowe or Hines could have gotten into the basement, he responded that D.W. may have woken up and let them in. In Detective Girard's opinion, it would have been impossible for D.W. to have made the video due to the position she was laying in as well as her condition. In the video she was making sounds that indicated to him that she was incoherent.

{¶15}  Mr. Martinez also disclosed for the first time in this interview that he put a "whole line" of meth upstairs for himself before D.W. arrived. Mr. Martinez said that when he and Rowe were in the basement, he got irritated with Rowe because Rowe was drunk, knocking things over and trying to hug D.W., so he took Rowe upstairs. Rowe then pulled out a bag of "garbage" meth that was not working and said he needed something better. Mr. Martinez gave Rowe the meth that he had previously stored upstairs so that Rowe could sober up, then watched him snort it. Mr. Martinez denied that he saw D.W. take any meth and stated that he did not know how she got it.

{¶16}  Mr. Martinez's parole officer, Stephanie Rodriguez, testified that she spoke with Mr. Martinez on February 2, 2024, and that he admitted to using meth. She drug-tested him and the test was positive for meth. Zimmerman testified that after Hines woke him up and told him to call 911, he handed the phone off to Rowe, then later found out that there was a woman unresponsive in the basement. He confirmed that the basement door had to be locked from the inside.

{¶17}  Hines testified that when D.W. arrived, he saw on the security cameras that she was carrying some cans of alcohol. When Rowe arrived about an hour later, he appeared to be intoxicated and was carrying a bottle of Jack Daniels, so Hines let him in to sober up. Hines said that Rowe pulled out a large bag of a glassy-looking crystalline substance that that he believed to

be meth. After he told Rowe he did not want to get high or do shots with him, Hines went to bed. He was later awakened by Mr. Martinez screaming for someone to call 911. Because Hines did not have phone service, he woke Zimmerman up and told him to call 911. Hines admitted on cross-examination that he did not know Mr. Martinez well but said they had gotten into a few physical and verbal altercations in the past. When asked if he knew whether Martinez had provided meth to Rowe on the night in question, he answered "I don't believe Mr. Martinez had anything that night." However, he admitted he did not know that Mr. Martinez was back to using meth and that Mr. Martinez gave Rowe a line of meth that Rowe consumed. Mr. Hines also admitted to being a recovering drug addict, to smoking a lot of pot, and to having a history of felony robbery convictions. Hines confessed that he was not sober from drugs in February 2024, but denied doing meth with Mr. Martinez that night. He also admitted to fleeing the residence after the 911 call was made because he had outstanding warrants and was afraid he would be arrested.

{¶18} Mr. Martinez testified as follows. After D.W. arrived at his basement residence on the evening of February 1, 2024, she drank three cans of the alcohol she had with her while Mr. Martinez gave her a tattoo. When Rowe came downstairs, he appeared to be drunk and high. Rowe then pulled out a bag of meth but did not show it to D.W. Mr. Martinez took Rowe upstairs, and Rowe did some lines of meth from his own bag but said it was "garbage[,]" so Mr. Martinez offered him the meth that he left on a plate on top of the refrigerator. Mr. Martinez said that "[w]hen somebody is that drunk, meth will straighten them right out." Mr. Martinez then went back downstairs and ate dinner with D.W. He said that Rowe then came back downstairs ranting about his sister's death and Rowe and D.W. drank alcohol. Mr. Martinez took Rowe back upstairs but because Rowe tried to get downstairs again, Mr. Martinez locked the door and told Rowe to go to

bed. Mr. Martinez and D.W. had sex around midnight then he fell asleep after taking his prescription muscle relaxer.

{¶19}   Mr. Martinez said he woke up around 4:30 a.m. to D.W. kicking, vomiting and struggling to breathe.  He administered NARCAN and CPR and screamed for someone to call 911 because he could not find his phone. He heard Rowe say the door was locked but Mr. Martinez claims he pulled the door open, describing it as "just a little sticky[.]"  Rowe was on the phone with 911.  Mr. Martinez testified that he did not use meth that night and that D.W. was not high when she arrived.  He denied taking the video of D.W.

{¶20}   On cross-examination, Mr. Martinez admitted to a history of crimes of dishonesty; *i.e.*, thefts, false alarm.  When asked why he left a plate of meth upstairs after he told D.W. he had cleaned the house to get rid of any drugs, he answered that he placed it where she would not see it.  He was also asked why he told Detective Girard that Rowe only came downstairs once but, in his testimony, stated that Rowe came down three or four times.  Mr. Martinez's answer was not responsive to the question.  Mr. Martinez denied taking the video and testified that he was asleep at that time.  He did not know how Rowe could have administered meth to D.W. when Mr. Martinez was the only one present in the basement with D.W. and the door was locked.  When asked why the door did not open when Rowe kicked it, but Mr. Martinez opened it just by pulling on it, Mr. Martinez denied that the door was locked and again stated that it was "just a little sticky."

{¶21}   At trial, the State's theory of the case was that Mr. Martinez gave D.W. meth to wake her up so that she could have sex with him.  Mr. Martinez's theory was that either Rowe gave D.W. meth or that D.W. had relapsed and brought her own meth and consumed it. The jury found Mr. Martinez guilty with the special finding that the substance involved was meth.  He was

sentenced to a prison term of six to nine years. He timely appealed and asserts two assignments of error for our review.  We will address them out of order for ease of analysis.

II.

**ASSIGNMENT OF ERROR II.**

**[MR. MARTINEZ'S] CONVICTION WAS AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE.**

{¶22}  When considering a challenge to the manifest weight of the evidence, this Court is required to consider the entire record, "weigh the evidence and all reasonable inferences, consider the credibility of witnesses and determine whether, in resolving conflicts in the evidence, the trier of fact clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered." *State v. Otten*, 33 Ohio App.3d 339, 340 (9th Dist. 1986). A reversal on manifest weight is reserved for an exceptional case in which the evidence weighs heavily against the conviction. *State v. Croghan*, 2019-Ohio-3970, ¶ 26 (9th Dist.).  This Court "will not overturn a conviction as being against the manifest weight of the evidence simply because the trier of fact chose to believe the State's version of events over another version." *State v. Barger*, 2016-Ohio-443, ¶ 29 (9th Dist.).

{¶23}  R.C. 2925.02(A)(3)(C)(1) prohibits corrupting another with drugs and provides in relevant part that "[n]o person shall knowingly. . . [b]y any means, administer or furnish to another or induce or cause another to use a controlled substance, and thereby cause serious physical harm to the other person[.] . . ."  Mr. Martinez does not challenge that D.W. died of intoxication from a meth overdose.

{¶24}  Mr. Martinez argues on appeal that the State failed to produce any testimony or evidence that he furnished meth or any other drug to D.W. and presented no proof of who gave meth to D.W.  Mr. Martinez emphasizes that no drugs were found in the residence during the police

search; that there is no evidence as to how Mr. Martinez got meth into D.W.'s system; and there was no mention in the text communication between Mr. Martinez and D.W. of drug use or that Mr. Martinez was going to supply D.W. with meth. Mr. Martinez argues that there are other explanations as to what happened, such as that D.W. was a recovering addict and could have relapsed or that Rowe, an admitted drug user who was high and drunk when he arrived, could have been the source. In support, he points to the testimony of Hines who stated that Rowe pulled out a bag of a substance resembling meth when he arrived at the Zimmerman residence. Mr. Martinez maintains that his presence with D.W. in the basement is the only basis for the jury's decision and as such, the jury lost its way and decided the case on "speculation, innuendo, salacious stories, and emotion" which is not enough to support Mr. Martinez's conviction.

{¶25} Detective Girard's testimony highlighted the various inconsistencies in the three interviews that he had with Mr. Martinez. He noted that Mr. Martinez did not mention during the first interview the woman who allegedly brought paper towels or that she had spoken with D.W. Mr. Martinez also did not disclose that he had a supply of meth and gave it to Rowe until the third interview, after he was confronted about the timeline discrepancy between his story and the video of D.W. on his phone. Mr. Martinez was never able to explain why the video is time-stamped over one half hour prior to the time he allegedly woke up to D.W. experiencing distress. On the other hand, according to Detective Girard, Rowe's testimony was consistent with his two interviews. Through Rowe's testimony, the State showed that Mr. Martinez had a fold of meth in his pocket when he went downstairs to the basement and was the only person with D.W. after Rowe came upstairs.

{¶26} In addition, it is noteworthy that Mr. Martinez changed his story about whether the door was locked, stating at trial that the door was "just a little sticky" and that he pulled it open

whereas in his interview with Detective Girard he stated that he locked the door to keep Rowe out. Mr. Martinez theorized that someone else came downstairs during the night and made the video when he was asleep and D.W. must have unlocked it. However, the 911 call reflects that Rowe kicked the door open which corroborates the fact that it was locked. Therefore, the jury could have reasonably concluded that no one from upstairs - Hines, Zimmerman, Rowe - could have easily gone downstairs and furnished D.W. with meth as the door was locked and that Mr. Martinez is the only one who could have furnished meth to D.W.

{¶27} Furthermore, Mr. Martinez admitted to relapsing on meth the week prior to D.W.'s death and told Detective Girard that he left the plate of meth upstairs for himself. Thus, by his own admission he had access to meth on the day in question. Mr. Martinez's parole officer testified that Mr. Martinez admitted to using meth and tested positive on February 2, 2024, the date of D.W.'s death. The jury could have reasonably inferred from that evidence that Mr. Martinez possessed meth when he was in the basement with D.W. The State also presented evidence through the testimony of D.W.'s father, Mr. Martinez, and Rowe that D.W. had at least three years of sobriety and was committed to staying sober. Mr. Martinez was consistent in his statements to the police and at trial that D.W. made him promise to make sure the house was clean from drugs and safe for her. Rowe testified that D.W. admonished him for seeking meth because she was trying to stay sober. Mr. Martinez himself testified that D.W. did not arrive with meth. Thus, the rational inference is that D.W. would not likely have relapsed and knowingly used meth.

{¶28} Based on our review of this record and the applicable law, we cannot conclude that this is an exceptional case where the jury clearly lost its way in finding Mr. Martinez guilty of corrupting another with drugs. The jury was free to consider the credibility of the various witnesses and "to believe all, part, or none" of each witnesses' testimony. *Prince v. Jordan*, 2004-

Ohio-7184, ¶ 35 (9th Dist.) We are mindful of the presumption in favor of the finder of fact due to its superior vantage in observing witness' testimony and "will not overturn a conviction as being against the manifest weight of the evidence simply because the [jury] chose to believe the State's version of events over another version." *State v. Hall*, 2017-Ohio-73, ¶ 22 (9th Dist.)

{¶29} Mr. Martinez's second assignment of error is overruled.

## ASSIGNMENT OF ERROR I.

**THE PROSECUTOR'S COMMENTS DURING THE TRIAL AND DURING CLOSING ARGUMENT WERE PREJUDICIAL AND DENIED [MR. MARTINEZ] HIS RIGHT TO A FAIR TRIAL.**

{¶30} In this assignment of error, Mr. Martinez argues that the Assistant Prosecutor made inflammatory and prejudicial comments during his cross-examination of Hines and at closing argument that prevented him from receiving a fair trial. He argues specifically that the Assistant Prosecutor's questioning was an attempt to convince the jury that Hines had come to court to lie because he did not like the Assistant Prosecutor and went beyond impeachment to an improper personal attack on Hines' credibility.

{¶31} The relevant portion of Hines' cross-examination is as follows:

Q [Assistant Prosecutor] Listen to my question. You don't much care for me personally, do you?

A [Hines] I don't know you, so that's not correct.

Q Well, you remember writing a kite?

A I do.

Q You named me in the kite, right?

A There was nothing out of line about it. It was just me trying to contact you.

Q Right.

A Because you said you would do something for me that you didn't.

Q You testified for me in another case, didn't you?

A Yeah, and I'm supposed to testify in another one.

Q Right. You're a jailhouse snitch.

A That's correct.

Q Right. And you think that I didn't do what I promised you I would do?

A That is correct.

Q Right. Which is, by the way, not true, but that's what you think, correct?

A I mean, you haven't contacted me, so I wouldn't know that. It's been six or seven months.

Q That wasn't what I was supposed to do. I was supposed to make a phone call for you, which I did, but you don't think - - you wanted me - - correct me if I'm wrong, you wanted me to get your case dismissed up in Cleveland? Your cases?

A I didn't think that was going to happen, but I wanted you to speak on my behalf.

Q Right. And I told you all I could do is make a call on your behalf.

A That's all --

Q And you don't think I did that.

A I know you didn't. I asked.

Q Well, that's not true, but you think I didn't do it so, therefore, you have an axe to grind, don't you?

. . .

Q You have an axe to grind with me, don't you?

A No, I don't.

Q No?

A I don't know you, so like I said before - -

Q You're fine.

{¶32} Mr. Martinez also challenges the following remarks made by the Assistant Prosecutor at closing argument regarding Mr. Martinez's testimony:

But [Mr. Martinez] has to make you believe all of this nonsense that he testified to for an hour-and-a-half, and that performance that he gave you that [Rowe] didn't help and [Rowe's] the bad guy and he's the hero (demonstrating) and with no tear. Not one tear, if you remember his performance on the stand, but he wanted you to believe that he really felt bad.

{¶33} Mr. Martinez argues that those remarks were an obvious and unjust attempt to convince the jury that Mr. Martinez's testimony was "fabricated and rehearsed[,]" and once again, went beyond the boundaries of impeachment to deny Mr. Martinez a fair trial.

{¶34} In order to determine whether the prosecution's statements denied Mr. Martinez the right to a fair trial,

a reviewing court determines if the prosecutor's actions were improper, and, if so, whether the substantial rights of the defendant were actually prejudiced. Isolated comments by a prosecutor are not to be taken out of context and given their most damaging meaning. Moreover, the defendant must show that there is a reasonable probability that but for the prosecutor's misconduct, the result of the proceedings would have been different.

(Internal citations omitted.) *State v. Bray*, 2004-Ohio-1067, ¶ 11 (9th Dist.).

{¶35} Mr. Martinez concedes that in both instances he forfeited all but plain error due to his trial counsel's failure to object to the alleged prejudicial remarks. In order to establish plain error, Mr. Martinez must establish that an error occurred, that the error was obvious, and that there is a reasonable probability that the error resulted in prejudice, meaning that the error affected the outcome of the trial. *State v. Rogers*, 2015-Ohio-2459, ¶ 22. "Notice of plain error . . . is to be taken with the utmost caution, under exceptional circumstances and only to prevent a miscarriage of justice." *State v. Long*, 53 Ohio St.2d 91 (1978), paragraph three of the syllabus.

{¶36} Regarding the Assistant Prosecutor's cross-examination of Hines, Mr. Martinez argues that the State's portrayal of Hines as "a snitch, a liar, and someone with an axe to grind with the Prosecutor" prejudiced him. He points out that where Rowe testified for the State that Mr. Martinez had meth on the date of D.W.'s death, both Mr. Martinez and Hines testified that

Rowe was the person who had meth on the date of the incident, and therefore, Hines' testimony was corroborative of Mr. Martinez's testimony and critical to his defense.

{¶37} Assuming without deciding whether the State's comments were improper, Mr. Martinez did not demonstrate that they affected the outcome of the trial. He asserts in his merit brief that this error "had a profound impact on the trial." However, other than this single allegation, he does not support his argument with any case law containing similar facts that this Court could correlate to the circumstances here. Under App.R. 16(A)(7) "[a]n appellant bears the burden of formulating an argument on appeal and supporting that argument with citations to . . . legal authority." *State v. Watson*, 2009-Ohio-330, ¶ 5 (9th Dist.). There is no dispute that Mr. Martinez had meth the day of the offense as Mr. Martinez admitted to the same. In addition, as Hines' testimony was corroborative of Mr. Martinez's testimony that Rowe also had meth, even without Hines' testimony, the jury heard testimony that Rowe had meth, thus Hines' testimony was not the only evidence of that fact. Also, even if Rowe had meth, it appears unlikely that he was the source of the meth that D.W. consumed as Mr. Martinez admitted he had his own supply of meth and was alone with D.W. in the basement during the hours before her overdose.

{¶38} It also came to light on cross-examination of Zimmerman that Zimmerman was very upset with Rowe because Rowe owed him money for cutting down the wrong trees on his property. As Hines and Zimmerman are in a romantic relationship, the jury could have inferred that aside from any resentment Hines had towards the Assistant Prosecutor, he may have had hard feelings towards Rowe because he owed Zimmerman money. Thus, even without the Prosecution's allegedly improper questioning, the jury still could have assumed that Hines came to court with a motive to lie about whether Rowe had meth. As previously noted, there also was substantial evidence in the record that even if Rowe had meth, Mr. Martinez had his own meth to give to D.W.

during the hours they were alone in the locked basement. Also, as noted in our analysis under his second assignment of error, there were considerable inconsistencies between Mr. Martinez's statements to Detective Girard and his trial testimony which called into question Mr. Martinez's credibility. Accordingly, we cannot consider that the State's comments resulted in a reasonable probability that the alleged misconduct resulted in prejudice.

{¶39} Regarding the Assistant Prosecutor's comments at closing argument, once again, Mr. Martinez makes conclusory allegations that those comments led the jury to finding him guilty without any citations to case law or other relevant authorities as required under App.R. 16(A)(7) to guide our analysis. These comments were not misconduct as the State is permitted to comment on a defendant's demeanor while testifying. *State v Green*, 90 Ohio St.3d 352, 373 (2000). Also, the trial court gave limiting, cautionary instructions to the jury that closing arguments are not evidence. "It is well-settled that juries are presumed to follow the trial court's instructions." *State v. Witcher*, 2012-Ohio-4141, ¶ 33 (9th Dist.). Thus, the comments to the jury were not error, and even if they were, they were not prejudicial.

{¶40} Furthermore, even assuming that the Assistant Prosecutor's remarks were improper, upon review of the record, we cannot conclude that they affected the outcome of the trial considering the wealth of evidence of Mr. Martinez's guilt produced by the State. Despite any error by the Prosecution in making prejudicial comments, the jury would have found Mr. Martinez guilty of corrupting another with drugs beyond a reasonable doubt. Therefore, Mr. Martinez has failed to meet his burden of demonstrating plain error here. His first assignment of error is overruled.

III.

{¶41}  Based on the foregoing, Mr. Martinez's assignments of error are overruled, and the judgment of the Medina County Court of Common Pleas is affirmed.

Judgment affirmed.

___

There were reasonable grounds for this appeal.

We order that a special mandate issue out of this Court, directing the Court of Common Pleas, County of Medina, State of Ohio, to carry this judgment into execution.  A certified copy of this journal entry shall constitute the mandate, pursuant to App.R. 27.

Immediately upon the filing hereof, this document shall constitute the journal entry of judgment, and it shall be file stamped by the Clerk of the Court of Appeals at which time the period for review shall begin to run.  App.R. 22(C).  The Clerk of the Court of Appeals is instructed to mail a notice of entry of this judgment to the parties and to make a notation of the mailing in the docket, pursuant to App.R. 30.

Costs taxed to Appellant.

SCOT STEVENSON
FOR THE COURT

FLAGG LANZINGER, P. J.
SUTTON, J.
CONCUR.

APPEARANCES:

MICHAEL J. GOEBL, Attorney at Law, for Appellant.

S. FORREST THOMPSON, Prosecuting Attorney, and STEFANIE H. ZARANEC, Assistant Prosecuting Attorney, for Appellee.